[Cite as *State v. Houston*, 2010-Ohio-6070.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                   CASE NO. 17-10-06

     v.

ELLIS HOUSTON,                       O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Shelby County Common Pleas Court
Trial Court No. 09CR000323

**Judgment Affirmed**

Date of Decision:   December 13, 2010

APPEARANCES:

    *Jonathan M. Richard*  for Appellant

    *Jeffrey J. Beigel*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Ellis Houston (hereinafter "Houston"), appeals the Shelby County Court of Common Pleas' judgment of sentence. For the reasons that follow, we affirm.

{¶2} On October 22, 2009, Houston was indicted by the Shelby County Grand Jury on three counts of breaking and entering in violation of R.C. 2911.13(A), each a felony of the third degree. These counts alleged that on three different dates, Houston broke into a store, once at the Lassus Handy Dandy and twice at Foodtown, both located on Wapakoneta Road in Sidney, Ohio, and stole cigarettes. Houston entered pleas of not guilty, and on January 5, 2010, the matter proceeded to a jury trial.

{¶3} The morning of trial, just before the venire was brought into the courtroom, counsel for Houston informed the court that he had attempted to speak with Houston that morning but that Houston would not answer his questions. Houston asked that his attorney be removed from the case and he be allowed to represent himself. The trial court discussed this request with Houston, permitted the prosecutor to speak on the issue, and then denied Houston's request because of its untimeliness.

{¶4} The jury trial commenced and the State presented the testimony of six witnesses. The State also introduced one exhibit, a DVD that contained video

surveillance from each of the three incidents. Between the testimony of two of the State's witnesses, defense counsel informed the court that the alibi witness for Houston, a witness for whom he had previously provided a notice of alibi, was not present. He further explained that he had arranged for her to be there for trial but that Houston had contacted her the previous night and "asked her not to be here in part because he believed that he was going to be able to represent himself today." (Jan. 5, 2010, Tr. at 91-92.) Thus, Attorney Clinard told the court that he did not have an alibi witness to present and was withdrawing the notice of alibi. (id.) At the conclusion of the State's case, the defense made a motion for acquittal, which was denied. The defense presented no evidence.

{¶5} After closing arguments, the jury was given instructions and returned verdicts of guilty on all three counts. The court ordered a pre-sentence investigation, and a sentencing hearing was conducted on February 8, 2010. Houston was sentenced to eleven months in prison on each count to be served consecutively to one another for an aggregate term of thirty-three months.

{¶6} Houston now appeals, raising three assignments of error for our review.

### ASSIGNMENT OF ERROR NO. I:

**THE TRIAL COURT ABUSED ITS DISCRETION IN NOT PERMITTING THE DEFENDANT/APPELLANT TO REPRESENT HIMSELF AND DISMISS HIS COURT APPOINTED ATTORNEY.**

{¶7} The Sixth Amendment to the United States Constitution provides that an accused shall have the right "to have the Assistance of Counsel for his defense." Alternatively, a criminal defendant has the "right to conduct his own defense." *McKaskle v. Wiggins* (1984), 465 U.S. 168, 170, 104 S.Ct. 944, citing *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525. Thus, although a defendant has a right to counsel, the defendant may "waive that right when the waiver is voluntary, knowing, and intelligent." *State v. Petaway*, 3rd Dist. No. 8-05-11, 2006-Ohio-2941, ¶ 8, citing *State v. Gibson* (1976), 45 Ohio St.2d 366, 345 N.E.2d 399, paragraph one of the syllabus, citing *Faretta*, supra. "If a trial court denies the right to self-representation, when properly invoked, the denial is per se reversible error." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 32, citing *State v. Reed*, 74 Ohio St.3d 534, 1996-Ohio-21, 660 N.E.2d 456, citing *McKaskle*, 465 U.S. at 177, 104 S.Ct. 944.

{¶8} While a defendant has the right to represent himself, that right is not absolute. Notably, the Ohio Supreme Court has held that an untimely invocation of the right of self-representation may be disallowed by a trial court. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 50. In *Vrabel*, the Court stated,

> **In the recent case of *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37, we reasoned that the defendant's request to represent himself was untimely, since it**

> **was made only three days before the trial was to begin. Other courts, as noted in *Cassano*, have also found that invocation of the right of self-representation can be disallowed where such a request is untimely. See, e.g., *United States v. Mackovich* (C.A.10, 2000), 209 F.3d 1227, 1237 (requests made within ten days before trial "were merely a tactic for delay"); *United States v. George* (C.A.9, 1995), 56 F.3d 1078, 1084 (request made on eve of trial untimely); *Parton v. Wyrick* (C.A.8, 1983), 704 F.2d 415, 417 (request made morning of trial untimely); *United States v. Frazier-El* (C.A.4, 2000), 204 F.3d 553, 560 (the "right does not exist * * * to be used as a tactic for delay").**

*Vrabel*, 2003-Ohio-3193, at ¶ 50.

{¶9} Here, Houston did not request to represent himself until the day of trial. In fact, the trial court specifically found that the prospective jury members were "in the jury room ready to proceed[.]" (Jan. 5, 2010, Tr. at 6.) Therefore, the trial court concluded that Houston's invocation of his right of self-representation was untimely. We agree.

{¶10} Not only did Houston wait until the day of trial, with the venire present and waiting to proceed, to invoke his right to self-representation, his reasons for the request to represent himself did not arise that day. To the contrary, Houston stated that December 17, 2009, was the first time his attorney came to see him at the jail, that at his first pre-trial he had problems with his attorney, and that he wanted to get more witnesses. Although Houston did not directly ask for a continuance, his stated reason, that he wanted to represent himself because he

wanted "to get more witnesses," certainly implied that he would need a continuance to do so, thereby delaying the trial of this matter.

{¶11} We find that Houston had sufficient time to properly invoke his right to self-representation and to then prepare for trial, but he chose not to do so until the day of trial. Thus, the trial court properly concluded that his request was untimely and did not err in overruling his request to represent himself. The first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. II

**THE DEFENDANT/APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDIENCE [*sic*] IN VIOLATION OF HIS DUE PROCESS RIGHTS, OR IN THE ALTERNATIVE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶12} In his second assignment of error, Houston contends that his convictions were not supported by sufficient evidence or, alternatively, were against the manifest weight of the evidence. Specifically, Houston does not maintain that the State failed to prove that three offenses of breaking and entering occurred in Shelby County, Ohio, on the dates alleged. Rather, he asserts that the State failed to prove that *he* was the actual perpetrator of these offenses. In support of this assertion, Houston argues that the two witnesses who identified him on the surveillance video as the perpetrator were both convicted felons and that neither was present at the crime scenes.

{¶13} The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668.

{¶14} Alternatively, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial

ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, ¶ 30, citing

*State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78

Ohio St.3d at 387, 678 N.E.2d 541.

**{¶15}** In this case, the State presented the following evidence. Meredith

Groves testified that she is the manager of the Handy Dandy on Wapakoneta

Avenue in Sidney, Ohio, and has worked there for three years. (Jan. 5, 2010, Tr.

at 50.) Handy Dandy is a convenience store that includes a Subway restaurant

carry-out but does not include a dine-in area. (id. at 52.) She further testified that

in the early morning hours of August 21, 2009, someone threw a "huge rock"

through the store's glass door and stole numerous "cartons of cigarettes and Black

& Mild cigars." (id. at 50-52.) During her testimony, Groves also identified

State's Exhibit 1 as a DVD that included a true and accurate copy of the video

surveillance of the break-in at the Handy Dandy that she had given to the detective

assigned to investigate the case.[1] (id. at 51.) This video shows an object being

thrown through the lower portion of the glass door, shattering the glass, and two

men entering the store through the opening created when the glass was shattered.

One man has no covering on his face, and the other has his face partially covered

with a white, scarf-like object. The two are directly in front of the camera during

---

[1] State's Exhibit 1 is a single DVD that contains the relevant portions of the video surveillance footage from each of the three break-ins.

the time they are in the store and the video shows them removing a number of items from the store.

**{¶16}** Keith Curtis, the manager of the Foodtown grocery store on Wapakoneta Avenue in Sidney, Ohio, also testified. (Jan. 5, 2010, Tr. at 57.) Curtis testified that in the early morning hours of August 24, 2009, someone broke the glass in the lower portion of the front door to the store by throwing a concrete block through it. (id. at 57-58, 61.) The intruder then entered the store and stole approximately $2,000.00 worth of cigarettes. (id. at 57-58.) Although the store was equipped with an alarm system, the alarm failed to activate on that occasion. (id. at 61.) Curtis also testified that the store was broken into again in the early morning hours of September 25, 2009. (id. at 58, 60.) Once again, the glass in the lower portion of the front door was broken to gain entry. (id. at 60.) However, this time a concrete flower pot was used to break the glass. (id. at 61.) Although the alarm was activated on this occasion, the intruder managed to steal approximately $1,000.00 worth of cigarettes and flee the scene. (id. at 60-61.)

**{¶17}** During his testimony, Curtis also identified State's Exhibit 1 as a DVD that contained true and accurate copies of the video surveillance taken at Foodtown during the two break-ins that he had given to the detective assigned to investigate the cases. (id. at 58-59.) Unlike the video footage from Handy Dandy, which was a streaming video, the Foodtown video surveillance was time lapsed.

This time lapse system operates by the camera taking still shots of whatever is in its sight approximately every six seconds. (id. at 62-63.) In addition, Foodtown had a number of time-lapse cameras in different locations of the store. These videos showed on both occasions the lower portion of the glass door being shattered, a man entering through the door, and that person taking items from the store. On the first video, the man is wearing the same white, scarf-like object to partially cover his face as one of the men in the Handy Dandy video is wearing. On the second video, the intruder is wearing a hooded sweatshirt but nothing directly over his face. The outside shot in this surveillance video also shows that it is raining.

{¶18} Officer Rodney Robbins of the Sidney Police Department testified that he was working third shift on August 21, 2009. (Jan. 5, 2010, Tr. at 65-66.) As he was patrolling in his police cruiser at approximately 2:00 a.m., he drove past the Handy Dandy store and noticed that the glass in the front door was broken. (id. at 66.) He and other officers secured the store and found multiple packs of Black & Mild cigars lying just outside the door. (id. at 67.) Officer Robbins also had his canine partner, Sid, with him, and he and Sid attempted to track the suspects. (id. at 68-69.) Although they did not locate any suspects in the fifteen to twenty minutes they spent tracking, they did recover more packages of Black & Mild cigars behind the store along the tree line. (id. at 69.)

-10-

**{¶19}** Dustin Hawkins also testified. Hawkins testified that he was currently in jail and that he had entered into a plea agreement with the State, whereby he plead guilty to one count of breaking and entering, a felony of the fifth degree, and agreed to testify in Houston's case, and in exchange the State dismissed two other counts of breaking and entering, both felonies of the fifth degree, against Hawkins. (Jan. 5, 2010, Tr. at 73.) Hawkins also acknowledged that he had prior felony convictions for robbery and burglary. (id. at 72.)

**{¶20}** Hawkins testified that he met Houston and Houston's brother, Anthony, in early August of 2009, or perhaps earlier through the Houstons' cousin, TJ Henderson. (id. at 83.) According to Hawkins, Houston told Hawkins that he and Anthony were the ones who broke into the Handy Dandy store and stole cigarettes. (id. at 73.) Hawkins also testified that he picked up Houston and Anthony at their home on September 25, 2009, and drove to Kossuth Street by the Sidney Foodtown and parked. (id. at 77-78.) Houston and his brother exited the vehicle while Hawkins waited in the car. Hawkins then heard a big bang and, shortly thereafter, the brothers ran back to the vehicle. (id. at 79.) When they returned, Houston was carrying a large bag that "looked like it had a bunch of cartons of cigarettes in it." (id. at 81.) In exchange for driving them, Hawkins testified that he was given cocaine. (id.)

{¶21} During Hawkins' direct examination, the prosecutor played the video footage from all three break-ins. (id. at 74-77, 79-80.) Hawkins identified both Houston and Anthony as the people depicted in the Handy Dandy footage, specifically indicating that Houston was the person with the white, scarf-like object partially covering his face. (id. at 74.) He further identified Houston as the person depicted in three different shots from the video footage of the first Foodtown break-in. (id. at 75-77.) Hawkins also identified Houston in the video footage of the second Foodtown break-in. More specifically, he noted that in this footage, Houston was wearing a "hoodie with, like, sweatpants[,]" and that these were the clothes Houston was wearing that night when Hawkins picked him up. (id. at 79-80.) Hawkins was shown another shot from the video of the second Foodtown break-in and testified that the person in that shot appeared to be Houston as well. (id. at 80.)

{¶22} On cross-examination, Hawkins testified that he was convicted of burglary and robbery in Kentucky in either 2003 or 2004, and that he had served six years in prison for these offenses. (id. at 85-86.) He also testified that in order to have two of his charges dismissed, he had to "give up Ellis and his brother," had to testify against Houston and Anthony, and that if he did not testify against Houston, the "deal may * * * disappear[.]" (id. at 86-87.) When asked if he was expecting to be placed on community control at this time, Hawkins stated that he

did not expect that would happen. (id. at 86.) Hawkins also acknowledged that he allowed Anthony to obtain cable services at the home that Anthony and Houston shared by using Hawkins' name on the account but that he did not know whether Anthony "ran up the bill" and then did not pay it as asked by defense counsel. (id. at 83-84, 87.) He further testified that he was not present for the first break-in at Foodtown and when asked whether he told the police he was there, Hawkins answered that he did not tell the police that. (id. at 89.) When questioned further about this, Hawkins testified that he drove the Houston brothers in September and that he only drove them to one break-in, one time. (id.)

{¶23} During re-direct examination, the prosecutor asked Hawkins if there was "some reason why you remember September 25, '09, something that jarred your memory?" (id. at 90.) In response, Hawkins testified that "it was rainin' and I remember what, you know, I remember he – he had, like, a hoodie on when we got – we got in the car and he got out of the car." (id.) The prosecutor then asked Hawkins if the September 25, 2009 video showed that it was raining, and Hawkins stated that it did. (id.)

{¶24} The next witness to testify was Ulysee Robinson, Jr. Robinson testified that he had felony convictions in Georgia for armed robbery, assault, drug abuse, drug trafficking, and providing false information. (Jan. 5, 2010, Tr. at 94.) He also testified that he knew Houston and that Houston lived in his

neighborhood. (id. at 95.) Robinson testified that Houston told him about the breaking and entering at Handy Dandy and that he had some cigarettes that he got from the Handy Dandy without buying them. (id.) The prosecutor then asked Robinson if Houston told him about the breaking and entering of Foodtown, and Robinson replied, "[n]ot him quite, his brother did." (id.) Robinson further testified that he had watched the video surveillance from the Handy Dandy break-in and the first Foodtown break-in and that he saw Houston in both of these videos. (id. at 95-97.)

{¶25} During cross-examination, Robinson was asked if his conviction in Georgia for providing false information was based on testimony in court. (id. at 97.) Robinson answered that it was not and explained, "It had nothin' to do with court. It was – I had did [*sic*] somethin' else and I wasn't puttin' myself involved with it so they just got me with lying." (id. ) Defense counsel then asked if he meant that he gave false information to the police officers during part of an investigation, and Robinson stated, "He was providing false information to me too so we both was doin' it." (id. at 98.) Robinson also admitted that he was convicted of three counts of drug trafficking in Ohio. Robinson further testified that he was first contacted about these break-ins when the police came to his home to execute a search warrant. (id. at 99-100.) During this search, the police found cigarettes. (id. at 100.) Robinson was asked if Hawkins gave him these cigarettes

and what his relationship was with Hawkins. (id.) Robinson testified that he did not know Hawkins and that Hawkins did not give him the cigarettes that were found in his home. (id.) Robinson further testified that he was not charged with anything relating to the cigarettes found in his home and he did not expect to be. (id.)

{¶26} On re-direct examination, Robinson testified that cigarettes were not found in his home and explained that they were actually cigarettos, which he described as mini-cigars. (id. at 101-102.) Robinson also testified that the cigarettos came from Houston and his brother and that he bought them from Houston for $2.00-2.50 a pack although they have a retail price of $3.00-4.00. (id. at 102.)

{¶27} Detective Jack Baker of the Sidney Police Department also testified. Det. Baker was assigned to investigate the three break-ins at issue. During his investigation, he viewed the video surveillance from all three break-ins. (Jan. 5, 2010, Tr. at 105-106.) He further testified regarding the mode of entry into Handy Dandy and Foodtown when they were broken into and what was taken from the businesses. (id. at 106-107.) Det. Baker also testified that the Black & Mild "cigars" that were taken were cigarettos such as the ones described by Robinson during his testimony. (id. at 106.)

**{¶28}** During cross-examination, Det. Baker stated that he was not in charge of collecting evidence for these three break-ins, but rather, that was the responsibility of the respective evidence technicians called to each scene. (id. at 107-108.) However, he did acknowledge that as the detective assigned to these cases, he was aware of the evidence that was collected in each incident. (id. at 108.) Det. Baker testified that none of the objects used to break the glass in the doors was collected but that the Black & Mild packages found behind Handy Dandy by Officer Robbins, the glass, and a lift of a shoeprint found at one of the scenes were collected. (id. at 109-110.) However, none of these items had any testing performed on them.[2] (id. at 110.) Det. Baker also testified that to his knowledge no cigarettes or Black & Milds were found at Houston's home after his arrest. (id.) Defense counsel also had Det. Baker read a portion of his police report detailing the discussion he had with Hawkins on October 2, 2009, which stated, "Dustin did not drive them to Sidney Foodtown on the second occasion it was broken into but he knows – but he knows they did it. * * * They [*sic*] knows they did that, too." (id. at 113.)

**{¶29}** On re-direct, Det. Baker testified that the objects used to break the glass in the doors were not taken as evidence and examined because fingerprints are never lifted from concrete blocks or rocks. (id. at 115.) He also testified that

---

[2] Det. Baker testified that the shoeprint lift was sent to the lab but he never heard anything back from the lab regarding the lift. (id. at 110.)

-16-

the video surveillance shows the blocks and flower pot used to break the glass in the doors. (id. at 114-115.) During re-cross examination, Det. Baker was asked about obtaining fingerprints from the cellophane wrapping of the cigarettes that were recovered by Officer Robbins, and he testified that obtaining fingerprints from evidence is difficult. (id. at 115.)

{¶30} At the conclusion of this evidence, the State moved to admit Exhibit 1, it was admitted, and the State rested. Houston did not present any evidence.

{¶31} After reviewing this evidence and in construing it in a light most favorable to the prosecution, we cannot conclude that there was insufficient evidence for Houston's convictions. Moreover, we cannot conclude that his convictions were against the manifest weight of the evidence.

{¶32} The jury was able to view the demeanor of the witnesses, including their candor. Both Hawkins and Robinson positively identified Houston in the surveillance videos from Handy Dandy and the first Foodtown break-in, and Hawkins also identified Houston in the footage from the second Foodtown break-in. Hawkins testified that Houston admitted to him that he broke into the Handy Dandy. In addition, Hawkins stated that he drove Houston to the second break-in at Foodtown, which he remembered involved inclement weather. The video surveillance of this break-in shows that it was raining during this time. The weather also served to explain the difference in Hawkins' statement to Det. Baker

-17-

that he drove Houston to the first Foodtown break-in and his testimony at trial that he drove Houston to the second Foodtown break-in because he testified that his memory was "jarred" about it being rainy on the night that he drove. Robinson further testified that Houston told him about breaking and entering into Handy Dandy and attempted to sell him cigarettes that he got from Handy Dandy but did not pay for them.

{¶33} While Hawkins received the benefit of two charges being dismissed by testifying against Houston, Robinson had no such benefit. Further, the jury was well aware of the credibility issues of these two men, including their respective felony records. However, they saw these witnesses testify, were able to view the video surveillance themselves, and were able to see Houston first-hand and determine whether he was the person in the videos. Although two of the videos showed the man identified as Houston wearing a white, scarf-like covering over his face, much of his face can still be seen and his build and what he was wearing are readily ascertainable. Furthermore, the evidence showed the same modus operendi during each incident: the perpetrator obtained entry by breaking the lower portion of the glass front door, immediately went to the tobacco products, stole only cigarettes and Black & Milds, stayed inside the store for a very short period of time, and wore similar clothing and head coverings. Thus, a reasonable juror could conclude that Houston committed all three offenses. Accordingly, we

do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. The second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. III

**THE DEFENDANT WAS DENIED HIS CONSTITUIONAL [*sic*] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶34} In his third assignment of error, Houston maintains that he was denied his right to the effective assistance of counsel. More specifically, Houston asserts that his trial counsel was ineffective for failing to meet with him and prepare, failing to request that the court make further inquiry into his desire to represent himself, failing to issue a subpoena for the alibi witness, failing to file a motion to sever the counts, and failing to object to the hearsay testimony of Robinson.

{¶35} A defendant asserting a claim of ineffective assistance of counsel must establish that (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306, 2001-Ohio-191, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052. In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable

professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 1998-Ohio-343, 693 N.E.2d 267.

{¶36} Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-42, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶37} Houston's first claim that his counsel was ineffective is that his attorney did not meet with him and prepare. However, the record belies this claim, as Houston actually informed the court that his attorney came to see him on December 17, 2009, and counsel stated that he had met with Houston the previous day and discussed the case with him. (Jan. 5, 2010, Tr. at 6.) Further, the only

complaints lodged by Houston about trial counsel was that he did not come to see him at the jail until mid-December and that he needed more witnesses. The record is devoid, as is the brief in this case, as to what trial counsel should have or even could have done to prepare this case, much less what prejudice Houston suffered as a result. Therefore, we cannot conclude that trial counsel was ineffective in this regard.

{¶38} Houston next asserts that trial counsel was ineffective for failing to request that the trial court make further inquiry into his desire to represent himself. Again, Houston has failed to demonstrate how counsel's performance was deficient or unreasonable under the circumstances or how he was prejudiced as a result of this failure, particularly in light of our discussion in the first assignment of error.

{¶39} As for Houston's claim that counsel was ineffective for failing to issue a subpoena to his alibi witness, the record also belies this assertion. Defense counsel informed the court that he had made arrangements to have Bridgette Stoudimire, Houston's alibi witness, testify at trial but that Houston contacted her the day before trial and told her not to appear at trial. Trial counsel had no duty to subpoena Stoudimire under these circumstances because he had made arrangements with her to voluntarily testify for Houston and there is nothing in the record to indicate that she would not have appeared. Apparently, the only reason

she did not appear was because Houston, the party on whose behalf she was going to testify, called her and told her not to come. Thus, even if defense counsel issued the subpoena on Houston's behalf, Stoudimire was not obligated to follow the commands of the subpoena once Houston told her that she need not appear. See Crim. R. 17(G). Moreover, Houston has proffered no information regarding what Stoudimire's testimony would have been, including whether she would have been an alibi for one, two, or all three incidents. Therefore, he has failed to demonstrate that counsel's performance was deficient or unreasonable under these circumstances or that he suffered prejudice as a result.

{¶40} Houston also contends that counsel was ineffective for failing to file a motion to sever these three offenses. A failure to file a motion does not constitute ineffective assistance of counsel per se. See *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52. There must also be a reasonable probability that the motion will be successful. *State v. Robinson* (1996), 108 Ohio App.3d 428, 433, 670 N.E.2d 1077; *State v. Ligon*, 3rd Dist. No. 4-2000-25, 2001-Ohio-2231.

{¶41} The Rules of Criminal Procedure permit the joinder of offenses when they "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan[.]" Crim.R. 8(A). Generally, the law favors joining multiple offenses in a

single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. "[J]oinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, [and] diminishing the inconvenience to witnesses * * *." *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 421 N.E.2d 1288. An accused may move to sever the charges under Crim.R. 14, but he has the burden to affirmatively demonstrate that his rights will be prejudiced by the joinder. *Lott*, supra. A showing by the State that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper. *Id.*; *State v. Roberts* (1980), 62 Ohio St.2d 170, 405 N.E.2d 247.

{¶42} As previously discussed in the second assignment of error, these charges were identical counts of breaking and entering and the facts surrounding each incident was of a similar character and demonstrated a common scheme and/or plan. Thus, they were properly tried together pursuant to Crim.R. 8. Moreover, Houston has not demonstrated any prejudice, and any such claim of prejudice would have been negated by the simple and direct evidence relating to each crime. We find that there was not a reasonable probability that if counsel had filed a motion to sever that it would have been successful, and counsel did not render ineffective assistance by failing to file a motion to sever.

{¶43} Lastly, Houston argues that counsel was ineffective for failing to object to the hearsay testimony of Robinson. During Robinson's testimony, the following line of questioning occurred between the prosecutor and Robinson:[3]

**Q: Defendant tell you about the breaking and entering of Foodtown?**

**A: Not him quite, his brother did.**

(Jan. 5, 2010, Tr. at 95.) Counsel for Houston did not object to this testimony.

{¶44} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Here, Robinson did not provide a statement made by Anthony to prove the truth of the matter asserted. Instead, he simply stated that Anthony told him about the breaking and entering of Foodtown; he did not say *what* Anthony told him about the breaking and entering. Accordingly, this testimony did not constitute hearsay. Further, even if this were hearsay, there was nothing in this statement to implicate Houston, and the State did not proceed any further with this line of questioning. Thus, Houston has not

---

[3] Houston cites to page 98 of the trial transcript in his argument of this point. However, that page contains the questioning of Robinson by Houston's trial counsel regarding Robinson's prior convictions. Nevertheless, in his second assignment of error, Houston references hearsay testimony elicited on page 95 of the transcript. In reviewing that page, the State's brief assumes that Houston is referring to the portion of transcript involving what Houston told Robinson. We do not make the same assumption, understanding that a statement of a party opponent, such as Houston, is not hearsay, see Evid.R. 801(D)(2)(a). Rather, we can only assume that Houston is referring to the portion involving what Anthony told Robinson. Although we elect to analyze this issue under this assumption, we note that App.R. 16(A)(7) places the responsibility on the appellant to cite to the proper parts of the record upon which he bases his argument.

shown any prejudice from the failure to object to this testimony. Absent a showing of prejudice, Houston has not shown that he was denied the effective assistance of counsel.

**{¶45}** For all of these reasons, the third assignment of error is overruled.

**{¶46}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and ROGERS, J., concur.**

**/jlr**