[Cite as *State v. Hesseling*, 2025-Ohio-5102.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

RONALD HESSELING, II,

    DEFENDANT-APPELLANT.

CASE NO. 1-24-34

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court

Trial Court No. CR2021 0343

Judgment Affirmed

Date of Decision: November 10, 2025

APPEARANCES:

    *Chima R. Ekeh* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**MILLER, J.**

{¶1} Defendant-Appellant, Ronald Hesseling, II ("Hesseling"), appeals from the April 5, 2024 judgment issued by the Allen County Court of Common Pleas, sentencing him following a jury trial. Hesseling argues he was denied effective assistance of counsel, the trial court failed to give a required jury instruction, his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and the trial court erred in imposing multiple major-drug-offender prison terms. For the reasons that follow, we affirm.

## I.     FACTS AND PROCEDURAL HISTORY

{¶2} The State's overarching claim against Hesseling was that he was the pill presser of illegal drugs for Eric Upthegrove ("Upthegrove") in their drug enterprise. This included charges for Hesseling possessing, trafficking, and manufacturing controlled substances. Hesseling proceeded to trial on multiple counts of drug possession, multiple counts of drug trafficking, a single count of illegal manufacture of drugs, and a single count of engaging in a pattern of corrupt activity. Many counts also included a major-drug-offender ("MDO") specification.

{¶3} The three-day trial was held from April 1 to 3, 2024. The State's first witness was the lead investigator in a drug task force, Detective Aaron Montgomery ("Detective Montgomery"). He described how the task force investigated a large fentanyl pill press operation in Allen County, from the summer of 2020 until

September 2021. The investigation included surveillance, interviewing witnesses, using controlled buys, and executing numerous search warrants. The investigation concluded with law enforcement seizing thousands of fentanyl pills, nearly one hundred pounds of fentanyl, and a significant amount of drug currency, along with the arrests of Upthegrove and Hesseling.

{¶4} Detective Montgomery testified that, on September 11, 2021, law enforcement officers monitored Upthegrove's movements through GPS tracking and direct observation. They monitored Upthegrove as he returned to Lima from Columbus around 6:30 p.m. that day. Law enforcement then continually surveilled several locations where Upthegrove was known to frequent. One of those locations was a house located on Broadway in Lima ("the Broadway house"). Upthegrove stopped at the Broadway house with his then-girlfriend, Nicoya Darby ("Darby"). He briefly entered the house then left it to go back to his residence. Upthegrove subsequently returned to, and left, the Broadway house by himself a few different times over the course of the evening.

{¶5} Then, although law enforcement did not observe Hesseling enter the Broadway house during their surveillance that day, they observed Upthegrove and Hesseling exit the Broadway house together. Hesseling was holding a brown paper bag, he entered a car that had pulled up to the house, and the car drove off. Officers never lost sight of that car and soon made a traffic stop. They arrested Hesseling, who had $450 in cash on him and THC gummies in the brown paper bag.

{¶6} After Hesseling's arrest, members of the task force searched the Broadway house. During the search they found two pill presses in the basement (one manual and one automatic), scales, sifters, blenders that could be used to mix different substances to make drugs, bags of a binding agent used to make pills by mixing it with substances to give pills a particular color and texture, and what turned out to be very large amounts of illegal drugs. Using pictures of the basement at the Broadway house taken during the search, Detective Montgomery pointed out these items, including different colors of binding agent in separate bags and numerous plastic containers—some of which contained a particular color of fentanyl powder or a particular color of large amounts of fentanyl pills.

{¶7} Among the other witnesses for the State was Darby, Upthegrove's now ex-girlfriend. Darby admitted she had been charged for her involvement with Upthegrove and Hesseling. She further admitted she had counted illegal pills, but claimed that was the extent of her involvement.

{¶8} Darby testified Upthegrove and Hesseling had been friends since they were young. According to Darby, she witnessed Hesseling's involvement with Upthegrove in their illegal pill business. She also testified that, about four months prior to Hesseling's arrest, she saw Hesseling sitting at a pill press machine used to make the pills. She testified Hesseling was physically working the machine. She was unaware of anyone else who pressed pills for Upthegrove besides Hesseling, and she never saw Upthegrove operate a pill press. According to Darby, she

specifically overheard Hesseling on one occasion tell Upthegrove that he (Hesseling) had made the pills.

{¶9} Darby testified that Hesseling informed Upthegrove he wanted to receive THC edibles in exchange for being the pill presser. She further testified about a picture she received from Upthegrove that was admitted into evidence. According to Darby, the picture was of Hesseling near a pill press in the basement of the Broadway house.[1]

{¶10} The jury found Hesseling guilty on all counts. The trial court proceeded to sentencing, during which it merged groups of counts involving the same fentanyl-related compound. Additionally, the State informed the court that the single count of illegal manufacturing of drugs merged with all of the various drug possession and drug trafficking counts. Ultimately, the trial court sentenced Hesseling on ten counts: seven counts of possession of a fentanyl-related compound, in violation of R.C. 2925.11(A); two counts of trafficking in a fentanyl-related compound, in violation of R.C. 2925.03(A)(2); and one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1). The trial court also sentenced Hesseling on seven MDO specifications under R.C. 2941.1410(B) that had been included in five of the possession counts and both trafficking counts. The

---

[1] Detective Montgomery likewise identified the basement of the Broadway house as the location of that picture based on a variety of the basement's features shown in the picture, and he also identified Hesseling as the person in the picture based upon Hesseling's physical stature, hair, and tattoos.

trial court imposed an aggregate prison term of 53 years to 58-1/2 years. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶11} Hesseling raises six assignments of error for our review:

### First Assignment of Error

**The trial court erred in imposing multiple major drug offender (MDO) prison terms.**

### Second Assignment of Error

**Appellant's convictions were not supported by sufficient evidence.**

### Third Assignment of Error

**Appellant's convictions were against the manifest weight of the evidence.**

### Fourth Assignment of Error

**Appellant was denied effective assistance of counsel.**

### Fifth Assignment of Error

**The trial court committed plain error in failing to give the required cautionary instruction pursuant to R.C. 2923.03(D).**

### Sixth Assignment of Error

**The cumulative effect of the errors at trial deprived Appellant of a fair trial.**

## III. DISCUSSION

{¶12} We address Hesseling's six assignments of error in an order that best facilitates our analysis.

### A.    Fourth Assignment of Error

{¶13} In the fourth assignment of error, Hesseling argues he was denied effective assistance of counsel by his trial attorney.  This claim has two bases.  First, Hesseling argues his trial counsel was ineffective by failing to file a motion to suppress evidence obtained from an alleged warrantless search of his cell phone.  Second, he argues his trial counsel was ineffective by failing to object to three alleged hearsay statements by one of the State's witnesses during the trial.

### 1.    Applicable Law

{¶14} The appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel, because a properly licensed attorney is presumed to carry out his or her duties in a competent manner.  *State v. Cartlidge*, 2020-Ohio-3615, ¶ 39 (3d Dist.).  To establish ineffective assistance of counsel, the appellant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."  *State v. Tench*, 2018-Ohio-5205, ¶ 264.  "Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying this two-pronged test, and the failure to make either showing is fatal to the claim."  *State v. Radabaugh*, 2024-Ohio-5640, ¶ 51 (3d Dist.), citing *State v. Conway*, 2006-Ohio-791, ¶ 165, 168.

{¶15} Regarding the first requirement, "[i]n order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment." *State v. Houston*, 2010-Ohio-6070, ¶ 35 (3d Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Judicial scrutiny of counsel's performance should be highly deferential and refrain from second-guessing strategic decisions of trial counsel. *State v. Sallie*, 81 Ohio St.3d 673, 674-675 (1998). "[T]he errors complained of must amount to a substantial violation of counsel's essential duties to his client." *Houston* at ¶ 36.

{¶16} Regarding the second requirement, "[p]rejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Houston* at ¶ 36, quoting *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142.

2.     **Analysis**

a.     **Failure to file motion to suppress**

{¶17} Failure to file a suppression motion does not constitute per se ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). Additionally, to establish that counsel was ineffective for failing to file a motion to

-8-

suppress, the appellant must demonstrate that such motion would have been successful if made. *Cartlidge*, 2020-Ohio-3615, at ¶ 41 (3d Dist.).

**{¶18}** Here, the record does not demonstrate that the hypothetical motion to suppress would have been successful. Significantly, despite Hesseling's assertion that Detective Montgomery personally went through his phone without a search warrant, the evidence in the record does not establish whether or not the State had a warrant to search Hesseling's cell phone at the time. Upon reviewing Detective Montgomery's testimony, it is unclear when he looked through Hesseling's phone and whether he had the authority to do so at that time.[2] (Trial Tr. at 296-299). In fact, some of the testimony seems to indicate he *did* have authority to look through Hesseling's phone, and that he then turned it over to another officer to extract the phone's data (e.g., *id.* at 297-298). *See State v. Gervin*, 2016-Ohio-5670, ¶ 21-23 (3d Dist.) (denying ineffective counsel claim based on failure to file motion to suppress where, although the trial transcript permitted an inference that law enforcement improperly executed the search warrant, there was no definitive evidence that was what occurred).

---

[2] In its response brief, the State represents that it was granted a warrant to search the cell phone and that warrant was provided to Hesseling's trial counsel in discovery. We note the record on appeal does not indicate what was included in any of the 13 discovery responses provided by the State. Thus, we have no way of knowing whether or not a search warrant for Hesseling's phone was provided to defense counsel. If a search warrant for the cell phone was provided as the State claims, then trial counsel may have had no basis to file a motion to suppress. *See State v. Smalley*, 2019-Ohio-1572, ¶ 7 (3d Dist.) (appellant failed to carry burden of proving his counsel's performance was defective where his arguments were speculative and not supported by the record).

{¶19} "The record developed at trial is generally inadequate to determine the validity of a suppression argument on appeal." *Id.* at ¶ 23. Such is the case here. We do not know what testimony may have been elicited on the issue at a suppression hearing. *Id.* We have previously explained that, if the record is not clear or lacks sufficient evidence to demonstrate whether there is a reasonable probability that a suppression motion would have been successful, then a claim for ineffective counsel cannot be established. *Id.* Here, as in *Gervin*, "the record lacks sufficient evidence to permit this Court to determine the validity of [Hesseling's] suppression argument and therefore he has not shown that his trial counsel's performance was deficient or that the result would have been different if his trial counsel would have pursued this particular argument in" a suppression motion. *Id.*; *see also State v. James*, 2013-Ohio-5475, ¶ 19-23 (4th Dist.) (rejecting ineffective counsel claim for failure to file suppression motion where appellant relied on the fact the record was silent concerning whether or not he was arrested in order to argue the State could not seize his property without an arrest).

### b.    Failure to object to alleged hearsay

{¶20} Hesseling also directs us to three alleged hearsay statements made by Darby that he argues were inadmissible yet not objected to by his trial counsel. Initially we note that competent counsel may reasonably decide not to object in the jury's presence because objections tend to disrupt the flow of a trial and can be bothersome to the jury. *State v. Miller*, 2019-Ohio-4121, ¶ 40 (3d Dist.).

**{¶21}** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement. Evid.R. 801(C). A statement is not hearsay if it is offered for a purpose other than the truth of the matter asserted. *Id.*; *Miller* at ¶ 41. A statement also is not hearsay if it is an admission by a party-opponent, namely a statement offered against a party that is the party's own statement. Evid.R. 801(D)(2); *see also City of Marion v. Newell*, 2004-Ohio-2363, ¶ 6, 9 (3d Dist.) (criminal defendant's statement to third party overheard by police officer was not hearsay because it constituted a party-opponent admission).

**{¶22}** Upon our review of the record, it appears that some, if not all, of the statements at issue are not hearsay because they were offered for a purpose other than the truth of the matter asserted or were a party-opponent admission. For example, regarding the first statement at issue, the prosecutor asked Darby about a photo of the basement of the Broadway house with a man standing at one of the pill presses. Darby testified she received the photo from Upthegrove and Hesseling was the man standing at the pill press. Hesseling challenges the portion of Darby's response that Upthegrove told her, "Hesseling was taking a long time but that he [Upthegrove] was on his way." (Appellant's Brief at 20). Hesseling argues this statement was offered to prove the truth of the matter asserted, which he contends was that Hesseling was the pill presser for Upthegrove. (*Id.*) We disagree. The purpose of the testimony was to have Darby identify Hesseling in the picture, and it

did not matter if the statement at issue was true or not. It was irrelevant to the case if Hesseling actually was taking a long time or Upthegrove actually was on his way. *E.g., State v. Bell*, 2013-Ohio-1303, ¶ 57 (3d Dist.) (no ineffective assistance for failure to object to alleged hearsay because the excerpt of testimony was not offered to prove the truth of the matter asserted).

{¶23} Regardless, Hesseling has not shown the trial's result would have been different if his trial counsel had objected to all of the statements at issue and those objections were sustained. *State v. Brown*, 2002-Ohio-4755, ¶ 51 (3d Dist.). The statements at issue were made in the context of much more damaging statements to Hesseling's defense. For example, the first statement at issue was followed by direct testimony from Darby that the person in the picture was Hesseling at a pill press machine. (Trial Tr. at 374-375).

{¶24} Additionally, Hesseling complains about Darby's testimony that she overheard Upthegrove telling Hesseling that Hesseling "should have been done before [Darby] had got back." (*Id.* at 368). Yet, Darby had also just testified that Hesseling was physically working the pill press machine. (*Id.* at 367). In fact, Darby plainly testified that Upthegrove and Hesseling were involved in the illegal pill business, and Hesseling was the one who was pressing pills for Upthegrove to sell. Thus, in considering the totality of the evidence, Hesseling has not met his burden on the second requirement for an ineffective assistance claim.

{¶25} Hesseling's fourth assignment of error is overruled.

### B. Fifth Assignment of Error

{¶26} In the fifth assignment of error, Hesseling argues the trial court committed plain error by not providing the jury with an instruction similar to that set forth in R.C. 2923.03(D) concerning accomplice testimony. He asserts that Darby was an accomplice who testified against Hesseling and, therefore, the trial court was required to provide such an instruction.

### 1. Standard of Review and Applicable Law

{¶27} Hesseling concedes we review this issue for plain error. *See also State v. Holton*, 2017-Ohio-6934, ¶ 39 (3d Dist.) (where an instruction pursuant to R.C. 2923.03(D) was not given at trial, but appellant did not object, appellant waived all but plain error on appeal). To establish plain error, an appellant must demonstrate (1) an error, i.e., a deviation from a legal rule occurred; (2) the error is plain, i.e., it must be an obvious defect in the proceeding; and (3) the error affected substantial rights, i.e., the trial court's error affected the outcome of the proceeding. *State v. Morgan*, 2017-Ohio-7565, ¶ 2, 36-37, 52. The Supreme Court of Ohio has admonished courts that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Even when an appellant has met his or her burden of demonstrating all three requirements, "a court still has discretion whether or not to correct the error." *State v. Lynn*, 2011-Ohio-2722, ¶ 14.

-13-

**{¶28}** Pursuant to R.C. 2923.03(D),

(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'

Despite its mandatory nature, R.C. 2923.03(D) only requires substantial, not strict, compliance. *Holton* at ¶ 40.

### 2. Analysis

**{¶29}** Even if we assume the trial court erred in failing to give the jury an instruction in accordance with R.C. 2923.03(D), and such error was plain, Hesseling has not demonstrated it affected the trial's outcome.[3] Based on a review of the trial transcript, serious issues that could affect Darby's credibility were clearly raised and highlighted for the jury. For example, at the start of her testimony, Darby acknowledged she had been charged for her involvement with Upthegrove and Hesseling. She testified that, while she had not received any deals or promises in

---

[3] Among its arguments, the State contends that Darby did not qualify as an "accomplice" under R.C. 2923.03(D) because she was not specifically charged as an accomplice pursuant to R.C. 2923.03. We need not resolve this question in order to decide the assignment of error and, instead, assume she did qualify as an accomplice under the statute.

exchange for testifying, there was the understanding she *could* receive consideration in her case for testifying at Hesseling's trial. She also acknowledged she had not been entirely truthful about her involvement when she was first arrested and spoke with police officers. Moreover, she had been in a romantic relationship with Upthegrove for about a year at the time they were arrested, but she was now his ex-girlfriend.

{¶30} On cross-examination, Hesseling's trial counsel effectively explored how Darby's testimony could be biased, self-serving, and motivated to falsely implicate Hesseling. For example, she admitted she had been charged with the same offenses as Hesseling, which she acknowledged were "really, really serious charges" that could result in a prison sentence. (Trial Tr. at 379). She also admitted she was "hoping to receive consideration" for testifying. (*Id.* at 380). This included that she hoped to be able to resolve her case with a reduced amount of prison time or possibly only probation. Thus, the jury was aware from Darby's testimony that she could benefit from agreeing to testify against Hesseling and potentially be motivated to say what she believed the State simply wanted her to say.

{¶31} In closing arguments, the prosecutor said he was sure Hesseling's attorney would tell them Darby has a motive to lie and was involved in the alleged crimes. He explained that, "[j]ust because someone has a motivation [to lie] doesn't mean that they are lying, doesn't mean that they are doing something wrong. Everybody has a motivation, and that is why we talked about those tests of

truthfulness, weighing credibility." (*Id.* at 577). The prosecutor acknowledged Darby "told you that she decided to cooperate with the State in hopes of receiving some kind of consideration for coming forward" and admitting her involvement. (*Id.* at 613).

{¶32} Therefore, in accordance with the purpose for giving the cautionary accomplice testimony instruction, the jury was made aware of Darby's possible bias, reason to lie, and potential self-serving motivation behind her testimony. *See State v. Sheldon*, 2019-Ohio-4123, ¶ 68 (3d Dist.) (R.C. 2923.03(D)'s purpose is to ensure juries are informed that an accomplice's testimony is inherently suspect because an accomplice is likely to have a motive to conceal the truth or otherwise falsely inculpate the defendant).

{¶33} Also, Hesseling concedes the jury was instructed generally regarding its duty to evaluate the credibility of witnesses. *See id.* at ¶ 70 (in determining whether failure to give the accomplice testimony instruction was plain error, the reviewing court took into consideration that the trial court gave standard instructions on evaluating witness credibility); *State v. Sillett*, 2002-Ohio-2596, ¶ 21 (12th Dist.). This included informing the jurors they must consider the credibility of the witnesses to weigh the evidence and that, in judging credibility, they were to apply tests of truthfulness that would include the witness's interest and bias along with all of the facts and circumstances surrounding the testimony. (*See* Trial Tr. at 622-623). Additionally, as shown above, Hesseling's trial counsel was afforded the

opportunity to cross-examine Darby on issues reflecting her credibility—and he did cross-examine Darby on those issues. *Sheldon* at ¶ 70 (taking into consideration whether appellant's trial counsel was afforded the opportunity to cross-examine the accomplice on credibility issues); *Sillett* at ¶ 21.

{¶34} Based on our review of the trial transcript, we are not convinced the trial's outcome would have been different if the trial court had given the accomplice testimony instruction. Therefore, the omission of the instruction did not result in plain error. *Sillett* at ¶ 21.

{¶35} Hesseling's fifth assignment of error is overruled.

## C.      Second Assignment of Error

{¶36} In the second assignment of error, Hesseling argues his convictions were not supported by sufficient evidence.

### 1.      Standard of Review

{¶37} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Dent*, 2020-Ohio-6670, ¶ 15. Thus, our review is de novo. *Id.* A sufficiency challenge disputes whether a party met its burden of production at trial. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Dent* at ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Thus, "[i]n

assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *State v. Jackson*, 2023-Ohio-2193, ¶ 26 (3d Dist.); *see also Jenks* at 279.

### 2. Analysis

#### a. Drug possession

{¶38} Hesseling's drug possession convictions were for violating R.C. 2925.11(A), which provided, "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

{¶39} Hesseling claims the State's evidence was insufficient to fulfill the "possession" element of the drug possession convictions. According to Hesseling, this is because he was not in immediate physical possession of the drugs and officers observing him leave the Broadway location on September 11, 2021 was insufficient to establish constructive possession.

{¶40} Possession of drugs can be either actual or constructive. *State v. Johnson*, 2025-Ohio-713, ¶ 25 (3d Dist.). On appeal, the State argues it established that Hesseling had constructive possession of the drugs at issue. To have constructive possession of an item, the State must show the person was conscious of the presence of the item and the person was able to exercise dominion or control

over the item, even if the individual does not have immediate physical possession of it. *Id.*

{¶41} The State may prove constructive possession of drugs by circumstantial evidence alone. *Id.* at ¶ 26. Additionally, the surrounding facts and circumstances—including the defendant's actions—are evidence that the trier of fact may consider in determining whether the defendant had constructive possession. *Id.* Although the defendant's close proximity to the item is, by itself, insufficient to establish constructive possession, close proximity can be some evidence of constructive possession, and the defendant's presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession. *State v. Johnson*, 2023-Ohio-2638, ¶ 19 (3d Dist.). Furthermore, a jury is permitted to make a reasonable inference from the evidence. *Johnson*, 2025-Ohio-713, at ¶ 30 (3d Dist.) (defendant's trip to Detroit and large amount of cash found on him permitted the inference that defendant was aware of the presence of drugs and had dominion and control over them despite the drugs being found on another person).

{¶42} Reviewing the evidence in a light most favorable to the State, we conclude the jury could find, beyond a reasonable doubt, that Hesseling had at least constructive possession of the drugs at issue. Among the evidence presented at trial was the following. Darby testified that Upthegrove was involved in the illegal pill business, Hesseling was involved in that business too, and Hesseling was the one

who was pressing pills for Upthegrove. Law enforcement observed Hesseling and Upthegrove exiting the Broadway house on September 11, 2021, with Hesseling holding a brown paper bag. When Hesseling was arrested following the traffic stop shortly thereafter, he had $450 in cash on him and THC gummies in the brown paper bag. Darby testified that Hesseling pressed pills for Upthegrove in exchange for THC gummies; THC gummies were found on Hesseling at the time of his arrest and were also found in Upthegrove's residence. Law enforcement found (and photographed) the massive quantity of drugs at issue in the basement of the Broadway house, along with pill presses, mixers, scales, and binding agent to create pills. The almost total lack of furniture in the house (including no beds, no kitchen/dining room table, no television or computer) indicated there was virtually nothing to do in the house besides mix and press pills. Additionally, both Darby and Detective Montgomery identified Hesseling as the person in a picture of the Broadway house's basement with the pill press a few months prior to September 11, 2021. Detective Montgomery explained that much of what was shown in that picture was the same as what they found in the basement shortly after Hesseling's arrest. Other photos admitted in evidence included selfies from July 2021 of Hesseling in the Broadway house basement near a pill press.

{¶43} Thus, although possession cannot be inferred solely from Hesseling's mere access to the drugs by occupying the premises where they were found (*see* R.C. 2925.01(K)), here there was additional evidence beyond Hesseling's proximity

to the drugs that supported the "possession" element.[4] *Johnson*, 2025-Ohio-713, at ¶ 30-31 (3d Dist.) (based on circumstantial evidence and reasonable inference therefrom, State presented sufficient evidence that defendant had knowledge and possession of the drugs found on another person).

{¶44} Hesseling also claims there was a "fatal variance" in the indictment because "the State presented evidence derived from the summer of 2020 to August 2021 to establish his guilt of possession of drugs on or about September 11-12, 2021." (Appellant's Brief at 9). We disagree. The evidence presented from the summer of 2020 to August 2021 had multiple purposes, including to establish the "enterprise" element of the engaging-in-a-pattern-of-corrupt-activity charge that the State alleged occurred between July 6, 2020 and September 12, 2021. *See State v. Thomas*, 2025-Ohio-1321, ¶ 21, 24, 26 (3d Dist.) (earlier text messages involving uncharged drug activity were not impermissible other-acts evidence because they were relevant to proving existence of the enterprise and defendant's association with that enterprise). More importantly, Hesseling was convicted for possessing drugs on or about September 11-12, 2021, and Hesseling has not shown the jury was barred from considering evidence outside the date range of those specific offenses.

---

[4] Hesseling asserts the State relied on impermissible inference stacking to convict him. A trier of fact may not draw an inference based entirely upon another inference, unsupported by any additional fact or another inference from other facts. *State v. Cowans*, 87 Ohio St.3d 68, 78 (1999). Given the evidence presented, we disagree with Hesseling's assertion that the jury must have relied on impermissible inference stacking to convict him.

### b. Drug trafficking

{¶45} Hesseling's drug trafficking convictions were for violating R.C. 2925.03(A)(2), which provides that "[n]o person shall knowingly . . . [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

{¶46} Hesseling argues the State presented insufficient evidence to show he prepared any drugs for shipment or distribution on or about September 11-12, 2021. Initially, he incorporates and relies on the same arguments he made concerning his sufficiency of the evidence for his drug possession convictions. As shown above, we reject those arguments. He also asserts there was insufficient evidence to show that he prepared any drugs for shipment or distribution. "We have explained that circumstantial evidence has long been used to successfully support drug trafficking convictions." *State v. Lewis*, 2025-Ohio-2486, ¶ 15 (3d Dist.). Here, the evidence recovered from the Broadway house, shortly after Hesseling exited it, included the controlled substances themselves in such extremely large quantities that the pills had to have been prepared for shipment and subsequent distribution. This was further evidenced by the use of the pill presses, binding agent for making pills, mixers, a sifter, and scales. Darby testified that Hesseling pressed pills for Upthegrove, and she was unaware of anyone else who pressed pills besides

-22-

Hesseling. Reviewing the evidence in a light most favorable to the State, we conclude the jury could find, beyond a reasonable doubt, that Hesseling committed the trafficking offenses by knowingly preparing the controlled substances for distribution with reasonable cause to believe they were intended for sale by Upthegrove. R.C. 2925.03(A)(2).

### c.  Pattern of corrupt activity

{¶47} Hesseling was also convicted of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1), which provides, "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." The phrase "pattern of corrupt activity" "means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).[5] The term "corrupt activity" includes a host of illegal conduct, such as violating the drug possession, manufacturing, and trafficking statutes in Hesseling's other charges. R.C. 2923.31(I)(2)(c). In its bill of particulars and at trial the State contended that all of the other charges against Hesseling qualify as potential predicate offenses in the definition of corrupt activity.

---

[5] Although R.C. 2923.32 is based on the federal RICO statute, the phrase "pattern of corrupt activity" and its definition are unique to the Ohio statute. *State v. Schlosser*, 79 Ohio St.3d 329, 334 (1997).

{¶48} Here, Hesseling claims the State failed to prove he engaged in a "pattern of corrupt activity" because the incidents of corrupt activity identified by the State "constitute[d] a single event." R.C. 2923.31(E). We disagree. For example, among the evidence presented at trial was testimony and photographs establishing that law enforcement recovered approximately two kilos of fentanyl hidden inside of a five-gallon bucket in a furnace room at the Broadway house. Other evidence established that law enforcement recovered a clear container with numerous fentanyl pills ready for distribution sitting on a table in the main basement room. Although the various illegal drugs were discovered by law enforcement in a single search of the Broadway house, this discovery was indicative of separate instances of corrupt activity and led to separate charges for drug possession and drug trafficking. In our view, the possession of that bucket of powder fentanyl and preparing the pills for distribution were not so closely related to each other and connected in time and place to constitute a single event. Reviewing the evidence in a light most favorable to the State, we conclude the jury could find, beyond a reasonable doubt, two or more incidents of corrupt activity related to the affairs of the same enterprise, not isolated, and not so closely related to each other and connected in time and place that they constitute a single event, i.e., a pattern of corrupt activity.

{¶49} Hesseling's second assignment of error is overruled.

### D.     <u>Third Assignment of Error</u>

**{¶50}** In the third assignment of error, Hesseling asserts that his convictions were against the manifest weight of the evidence.

### 1.     **Standard of Review**

**{¶51}** The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting" evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Const., art. IV, § 3(B)(3).

### 2.    Analysis

**{¶52}** Hesseling argues that the convictions were against the manifest weight of the evidence because (1) comparing some of Darby's testimony at the trial to her testimony during an earlier trial[6] in this case shows she had credibility issues, (2) the indictment stated that the offenses occurred on or about September 11-12, 2021, but evidence produced at trial to convict Hesseling was from the summer of 2020 to August 2021, (3) the State's claim that Hesseling was in the basement of the Broadway house on September 11, 2021 was conjecture, (4) Hesseling had no fentanyl dust on him when he was arrested and law enforcement found no protective gear during the search, and (5) the State's intelligence analyst could not state with certainty that, based on location mapping, Hesseling was actually in the Broadway house, and law enforcement did not search Hesseling's residence, fingerprint the pill presses, or test the pill presses for DNA.

**{¶53}** First, regarding Darby's testimony from the earlier trial, while there could be appropriate circumstances to present that testimony during a later trial (e.g., proper impeachment), Darby's testimony from the earlier trial was never presented in the trial in which Hesseling was convicted.  Hesseling does not provide us with any authority that would allow us, in deciding a manifest-weight-of-the-evidence claim, to consider evidence from another trial that was not presented in the trial at

---

[6] The first trial in this case resulted in a mistrial being declared on the third day of trial.  Unless otherwise indicated, this opinion and all references to testimony and evidence relate only to the second trial.

issue. *See also State v. Moore*, 2025-Ohio-712, ¶ 81 (3d Dist.) (defendant failed to show that the stipulated admission of a piece of evidence during the first trial, which ended in a hung jury, was relevant to its admissibility during the second trial); *State v. Gau*, 2010-Ohio-5516, ¶ 21 (11th Dist.) (the actions and proceedings raised by appellant "occurred in the context of the first trial and were therefore irrelevant to the second trial").

{¶54} Next, our earlier discussion of Hesseling's "fatal variance" argument from the second assignment of error also applies to his argument concerning evidence from before the September 11 to 12 time period that was used to convict him. Moreover, the jury was permitted to make the reasonable inference from the evidence presented that Hesseling was pressing pills on or about September 11 to September 12, 2021 for Upthegrove to sell.

{¶55} Finally, Hesseling's remaining arguments, which attack the weight of the location mapping testimony and things the State did not show trial, do not negate the fact that the State presented more than enough evidence during the trial to convict him for the offenses. Ultimately, the jury did not clearly lose its way, and create a manifest miscarriage of justice, in resolving conflicts in the evidence. This is not an exceptional case where the evidence weighed heavily against the convictions.

{¶56} Hesseling's third assignment of error is overruled.

### E.    First Assignment of Error

{¶57} In the first assignment of error, Hesseling argues the trial court erred in imposing prision terms for each of the seven MDO specifications.  He claims R.C. 2929.14(B)(11) is clear that only a single prison term shall be imposed for multiple fentanyl-related offenses and MDO specifications that were all part of the "same transaction." (Appellant's Brief at 5).  We disagree.

#### 1.    Applicable Law

{¶58} Hesseling does not dispute that the convictions at issue involved fentanyl-related compounds that were different types (e.g., pills or a powdery substance), different colors, and found in different containers/areas of the basement at the Broadway house on September 11-12, 2021. (Appellant's Brief at 7).  Instead, he argues the court erred in deciding the last sentence of R.C. 2929.14(B)(11) did not bar it from imposing more than one three-year sentence for the seven MDO specifications.  Therefore, the issue involves a purely legal question as to whether the trial court erred in interpreting and applying the law to undisputed facts, and matters of law are reviewed de novo.  *State v. Futrall*, 2009-Ohio-5590, ¶ 6-7; *State v. Ashcraft*, 2022-Ohio-4611, ¶ 7.

{¶59} R.C. 2941.1410 provides for a MDO specification to be included in a count in the indictment.  R.C. 2929.14(B)(11), which is the statute at issue for purposes of this assignment of error, provides in relevant part,

> If an offender is convicted of . . . a felony violation of section 2925.03 or 2925.05 of the Revised Code or a felony violation of section 2925.11 of the Revised Code for which division (C)(11) of that section applies in determining the sentence for the violation, if the drug involved in the violation is a fentanyl-related compound . . . , and if the offender also is convicted of or pleads guilty to a specification of the type described in division (B) of section 2941.1410 of the Revised Code that charges that the offender is a major drug offender, in addition to any other penalty imposed for the violation, the court shall impose on the offender a mandatory prison term of three, four, five, six, seven, or eight years. . . . *A court shall not impose more than one prison term on an offender under division (B)(11) of this section for felonies committed as part of the same act.*

(Emphasis added.) R.C. 2929.14(B)(11). Hesseling concedes the conditions in the first sentence are met for each of the counts and specifications. He relies on the last sentence of the statute to contend all of his offenses were part of the same act or transaction.

### 2. Analysis

{¶60} Hesseling was convicted and sentenced on seven MDO specifications attached to seven counts:

- Count 1 for possession of a fentanyl-related compound, namely approximately 1,997.01 grams of a light blue-green substance;

- Count 2 for trafficking in a fentanyl-related compound, namely 4,345 round blue tablets weighing approximately 331.91 grams;

- Count 6 for trafficking in a fentanyl-related compound, namely 15,448 round red tablets weighing approximately 1,254.23 grams;

- Count 10 for possession of a fentanyl-related compound, namely approximately 100.76 grams of a purple substance;

- Count 12 for possession of a fentanyl-related compound, namely approximately 128.64 grams of a brown substance found in a plastic bag;

- Count 14 for possession of a fentanyl-related compound, namely approximately 331.43 grams of a brown substance found in a brown paper bag; and

- Count 16 for possession of a fentanyl-related compound, namely approximately 296.13 grams of a blue substance.

As the trial court found and explained during sentencing, each of these counts involved a different item, located in a separate container in the Broadway house's basement. Based on its interpretation of R.C. 2929.14(B)(11), the trial court decided the offenses were not "part of the same act." Accordingly, the trial court imposed all seven MDO specifications.

{¶61} Hesseling's argument contains a significant flaw. He argues that, based on the last sentence of R.C. 2929.14(B)(11), if an offender is convicted of a group of fentanyl-related offenses and MDO specifications "that were all part of the same *transaction*, the trial court must impose one prison term for the MDO specifications." (Emphasis added.) (Appellant's Brief at 5). However, the word "transaction" does not appear in R.C. 2929.14(B)(11). Instead, as opposed to some of the other subdivisions in R.C. 2929.14, the only operative word used is "act." *Compare* R.C. 2929.14(B)(1)(b) (using the phrase "felonies committed as part of the same act or transaction"); R.C. 2929.14(B)(7)(b) (using the phrase "felonies committed as part of the same act, scheme, or plan").

{¶62} As other courts have explained, the term "transaction" is broader than the word "act." *E.g.*, *State v. Thompson*, 1990 WL 34827, *1 (2d Dist. Mar. 29, 1990). In fact, Hesseling relies on *State v. Wills*, 69 Ohio St.3d 690 (1994), which explained that the term "transaction" is defined as "'a series of continuous *acts* bound together by time, space and purpose, and directed toward a single objective.'" (Emphasis added.) *Wills* at 691, quoting *State v. Caldwell*, 1991 WL 259529, *12 (9th Dist. Dec. 4, 1991). Thus, a transaction involves multiple acts. In contrast, we have explained that "'[t]he definition of the word 'act' includes 'the process of doing something; action' and 'something that is done or performed; deed.'" *State v. Lotzer*, 2021-Ohio-3701, ¶ 23 (3d Dist.), quoting *State v. Patton*, 74 Ohio App.3d 224, 229 (3d Dist. 1991); *see also Black's Law Dictionary* (12th Ed. 2024) (recognizing that "[e]ven something as static or passive as possession of a substance can be an act in criminal law"). Hesseling's reliance on arguing the felonies here were "part of the same act *or transaction*" simply does not demonstrate the trial court erred in interpreting a statutory provision that does not contain the word "transaction." (Emphasis added.) (Appellant's Brief at 7).

{¶63} Furthermore, based on the evidence presented, it does not follow that Hesseling's possession of, or trafficking in, the separate items in separate containers here were "felonies committed as part of the same act." *See State v. Napier*, 1998 WL 730890, *2 (12th Dist. Oct. 19, 1998) ("it does not follow that the possession of additional marijuana, over and above that required to complete the sale [for which

defendant was convicted of drug trafficking], resulted from or was connected with 'the same act'"). As an initial matter, regarding the two trafficking counts, Hesseling does not dispute that he could not simultaneously press both the blue tablets and the red tablets, due to the steps in the process and how the pill press operated. Additionally, the issue here does not involve whether Hesseling must have possessed the tablets as part of the same act in which he was trafficking them because all of the offenses—trafficking and possession—involved different items in different containers.[7] We do not believe it is necessarily the case that possessing one container of one substance is "part of the same act" as possessing a separate container of another substance.

{¶64} Hesseling's first assignment of error is overruled.

## F.    Sixth Assignment of Error

{¶65} In the sixth assignment of error, Hesseling relies on the cumulative-error doctrine to argue that the errors in this case, considered individually and

---

[7] This corresponds with the trial court's decision to merge counts that involved the same item (e.g., it merged counts 6, 7, 8, and 9 because all four involved the 15,448 round red tablets), but it did not merge the counts at issue. Hesseling does not argue the trial court committed any error in merging, or failing to merge, any of the counts. The trial court explained that the counts at issue each involved a separate substance in a separate container located somewhere in the Broadway house's basement. This distinguishes one of the main cases Hesseling relies on for his argument, *State v. Gill*, 2024-Ohio-2792 (1st Dist.). In *Gill*, the court held that the two counts involving a fentanyl-related compound must merge; one count was for trafficking in the fentanyl-related compound and the other was for possession of the fentanyl-related compound. *Id.* at ¶ 8, 68, 71. In fact, *Gill* never addressed the "same act" language in R.C. 2929.14(B)(11). In addition to this merger problem, the court in *Gill* held that "an additional prison term may only be imposed for an MDO specification if the drug involved is a fentanyl-related compound or mixture thereof." *Id.* at ¶ 70. This deals with the first sentence of R.C. 2929.14(B)(11), which is not at issue here. In *Gill*, there were separate counts involving heroin, cocaine, and a fentanyl-related compound. Therefore, the court in *Gill* found error in imposing additional prison terms for the MDO specifications attached to the counts involving heroin and cocaine. *Id.*

cumulatively, resulted in an unfair trial. "The cumulative error doctrine provides that 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Wesson*, 2013-Ohio-4575, ¶ 87, quoting *State v. Powell*, 2012-Ohio-2577, ¶ 223.

{¶66} Given that we did not find multiple errors, we will not apply the cumulative-error doctrine. *Wesson* at ¶ 88; *State v. Craft*, 2025-Ohio-2045, ¶ 39 (3d Dist.). Moreover, Hesseling does not explain how the alleged errors collectively deprived him of a fair trial. This is insufficient to demonstrate cumulative error. *Wesson* at ¶ 88 (it is not enough simply to intone the phrase 'cumulative error'). Hesseling's sixth assignment of error is overruled.

## IV. CONCLUSION

{¶67} For the foregoing reasons, Hesseling's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN and EPLEY, J.J., concur.**

**\*\* Judge Christopher B. Epley of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**

Case No. 1-24-34

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

_____
Mark C. Miller, Judge

_____
William R. Zimmerman, Judge

_____
Christopher B. Epley, Judge

DATED:
/jlm

**\*\* Judge Christopher B. Epley of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**

-34-