[Cite as *State v. Dingman*, 2024-Ohio-3327.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2024-CA-14 |
| v. | : | Trial Court Case No. 23 CRB 01370 |
| ERIC SHAWN DINGMAN | : | (Criminal Appeal from Municipal Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 30, 2024

. . . . . . . . . . .

THOMAS W. KIDD, JR., Attorney for Appellant

DANIELLE E. SOLLARS, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Eric Shawn Dingman appeals from a judgment of the Xenia Municipal Court convicting him of theft. The court sentenced him to 180 days in jail, placed him on probation for two years, and ordered him to pay restitution, a fine, and court costs. For the following reasons, we will modify the judgment to remove his jail

sentence and probation, and the judgment will be affirmed as modified.

I.      Facts and Course of Proceedings

{¶ 2} On October 26, 2023, Dingman was charged with one count of theft, a first-degree misdemeanor in violation of R.C. 2913.02(A).   He was appointed trial counsel through the Greene County Public Defender's Office.   On November 14, 2023, Dingman's trial counsel filed a notice of appearance, a motion for discovery, and a waiver of Dingman's right to a speedy trial.   On that same day, the trial court scheduled a pretrial hearing for January 12, 2024.

{¶ 3} At the pretrial hearing, Dingman's trial counsel informed the court that Dingman no longer wanted her to represent him.   The trial court allowed counsel to withdraw from representing Dingman.

{¶ 4} On January 16, 2024, the trial court issued an order setting February 14, 2024, as the trial date.   On February 6, 2024, Dingman sent an email to the court with the subject line of "Requesting to Postpone Trial hearing date."   The body of the email stated, in pertinent part:   "I am Pro Se and i need some time to prepare for court. February 14 is too soon and i will not be ready.   I am indigent and have to get some things together if we can please postpone it so i can be prepared it would be greatly appreciated.   I have already waived speedy and thank you in advance for the consideration."   The trial court denied the request for a continuance, noting that the case had been pending since November 2023.

{¶ 5} On February 7, 2024, Dingman sent another email to the trial court, stating

in pertinent part:

> Your Honor, I, as the attorney representing myself (pro se), must bring to the court's attention a matter of grave concern regarding the failure of both the prosecution and law enforcement to secure a pivotal video evidence that could exonerate me.
>
> Tim Hortons captured the alleged theft on video record and the police were made aware that there was a video of the incident and the video was never retrieved. I am requesting the matter be handled appropriately so as to not violate my constitutional rights and preserve the integrity of our justice system. Ascertaining respect for the law.

{¶ 6} The bench trial proceeded on February 14, 2024. Prior to receiving any testimony, the trial court allowed Dingman to explain what he was requesting in his February 7, 2024 email to the court. The State then explained that it did not have possession of any video recording from Tim Hortons.

{¶ 7} Joshua Carl testified first at the trial. Trial Tr. 6-25. On October 5, 2023, he was a manager of a Tim Hortons restaurant in Xenia, Ohio. He rode his bicycle to and from work. Carl had painted his bicycle very distinctive colors. He knew Dingman, and they had previously hung out together. Dingman stopped at Tim Hortons on October 5, 2023, and Carl gave him a sandwich and a drink. A little later that day, during a break at work, Carl noticed that his bicycle was gone. He suspected that Dingman had taken the bicycle, because no other customer had come into the restaurant since Dingman left. Carl sent a message to Dingman through Facebook Messenger asking if he had taken

Carl's bicycle. According to Carl, Dingman responded that "he had it because he wanted to verify that it wasn't his friend Jessica's bike and I was not getting my bike until he had verified that it wasn't his friend Jessica's." *Id.* at 14. Carl read some of the messages between him and Dingman into the record at trial. Dingman told Carl that he would get his bicycle back when Dingman received confirmation that it was Carl's bicycle. When Dingman refused to return the bicycle, Carl called the police and filed a police report.

{¶ 8} On cross-examination, Carl testified that he had never seen a video recording of the events that occurred at Tim Hortons on October 5, 2023, because he did not have the passcode to view any of the video recordings at that location; only the general manager did. Carl testified that he had told the police there was a video, but the general manager never retrieved the video. Carl stated that he and Dingman were friends. Carl estimated the value of his bicycle at $150 or $175.

{¶ 9} Xenia Police Officer Jordan Robinson testified next at the trial. *Id.* at 25-31. Around 6:19 p.m. on October 5, 2023, he was dispatched to a Tim Hortons restaurant in Xenia to investigate a bicycle theft. Carl explained to him what had happened with his bicycle. According to Officer Robinson, Carl stated that there was a video recording system at Tim Hortons, but when Officer Robinson contacted the general manager, the store did not have a copy of the video for him. Carl also showed Officer Robinson the Facebook Messenger conversation between Carl and Dingman.

{¶ 10} Dingman testified last at trial. *Id.* at 31-38. He explained that he had stopped by Tim Hortons on October 5, 2023, to get something to eat. Carl asked how he was doing, and Dingman told him that he had just gotten out of prison and was

homeless. Carl gave Dingman a meal and did not charge him for it. When he left the restaurant, Dingman saw "Ernie," a friend of Dingman's father. According to Dingman, Ernie took Carl's bicycle. Ernie told Dingman that the bicycle belonged to a woman named Jessica. Dingman later told Carl that he would get the bicycle back from Ernie if Carl could convince him that the bicycle did not belong to Jessica.

{¶ 11} The trial court found Dingman guilty of one count of theft in violation of R.C. 2913.02(A), a first-degree misdemeanor. The trial court sentenced Dingman to 180 days in jail but suspended 150 days of the sentence contingent on Dingman's successful completion of two years of probation. The court also ordered Dingman to pay a $250 fine, $150 in restitution to the victim, and court costs. Dingman filed a motion for a new trial, which the trial court denied. Dingman filed a timely notice of appeal from his judgment of conviction.

II. Dingman Did Not Make A Knowing, Intelligent, and Voluntary Waiver of His Constitutional Right to Counsel

{¶ 12} Dingman's first assignment of error states:

THE APPELLANT'S CONSTITUTIONAL RIGHT TO COUNSEL, WHICH IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS, WAS VIOLATED WHEN THE TRIAL COURT FAILED TO ENSURE THE APPELLANT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVED HIS RIGHT TO COUNSEL.

{¶ 13} Dingman argues that the record does not establish that he knowingly,

intelligently, and voluntarily waived his right to counsel in open court. Therefore, Dingman contends that the trial court was precluded from sentencing him to a period of confinement. The State responds that, "[w]hile it is undisputed that the record contains no written waiver of counsel, a review of the totality of the record shows that Appellant knowingly, intelligently, and voluntarily waived his right to counsel and desired to represent himself in this matter." Appellee's Brief, p. 4. We disagree.

{¶ 14} "We conduct a de novo review to determine, based on the totality of the circumstances, whether a defendant voluntarily, knowingly, and intelligently waived his right to counsel." *State v. Simkins*, 2019-Ohio-4369, ¶ 15 (2d Dist.), citing *State v. Perdue*, 2010-Ohio-565, ¶ 33 (2d Dist.). Pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, a criminal defendant has the right to assistance of counsel for his defense. *Gideon v. Wainwright*, 372 U.S. 335, 344-345 (1963); *State v. Martin*, 2004-Ohio-5471, ¶ 22. The right to counsel applies in misdemeanor cases, including cases involving petty offenses, that result in imprisonment. *Argersinger v. Hamlin*, 407 U.S. 25, 37-40 (1972); *Perdue* at ¶ 33. "This principle has been expanded to cases involving a suspended sentence, capable of subsequent revocation, resulting in incarceration." *State v. Davis*, 2009-Ohio-4786, ¶ 32 (2d Dist.), citing *Alabama v. Shelton*, 535 U.S. 654 (2002).

{¶ 15} Criminal defendants also have a corresponding right to self-representation. *Faretta v. California*, 422 U.S. 806, 819 (1975); *Martin* at ¶ 23. "Accordingly, defendants may defend themselves without the benefit of counsel when they knowingly, intelligently, and voluntarily elect to do so." *State v. Conard*, 2024-Ohio-1906, ¶ 12 (2d Dist.), citing

*State v. Wilson*, 2020-Ohio-2962, ¶ 41 (2d Dist.).

**{¶ 16}** Crim.R. 2(D) defines a "petty offense" as "a misdemeanor other than a serious offense." Under Crim.R. 2(C), a "serious offense" is "any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Where, as here, a defendant is charged with a "petty offense," Crim.R. 44(B) governs the appointment of counsel. Crim.R. 44(B) provides, in pertinent part:

> Where a defendant charged with a petty offense is unable to obtain counsel, the court may assign counsel to represent the defendant. When a defendant charged with a petty offense is unable to obtain counsel, no sentence of confinement may be imposed upon the defendant, unless after being fully advised by the court, the defendant knowingly, intelligently, and voluntarily waives assignment of counsel.

Further, "[w]aiver of counsel shall be in open court and the advice and waiver shall be recorded as provided in Rule 22." Crim.R. 44(C).

**{¶ 17}** "Courts are to indulge every reasonable presumption against the waiver of a fundamental constitutional right including the right to be represented by counsel." (Citations omitted.) *State v. Dyer*, 117 Ohio App.3d 92, 95 (2d Dist. 1996). The waiver must affirmatively appear in the record, and the State bears the burden of overcoming presumptions against a valid waiver. *Id.*

**{¶ 18}** "In order to establish an effective waiver of right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right." *State v. Gibson*, 45 Ohio St.2d 366 (1976),

paragraph two of the syllabus. "To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." *Von Moltke v. Gillies*, 332 U.S. 708, 723-724 (1948). To be valid, a waiver of counsel " 'must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.' " *Gibson* at 377, quoting *Gillies* at 723.

{¶ 19} There was no discussion at the bench trial regarding Dingman's waiver of his right to counsel. At the pretrial hearing, however, the following discussion occurred on the record:

MS. LENNON: - - Dingman indicated he - - I don't think he wants me representing him any longer.

THE DEFENDANT: Your Honor, I'd like to represent myself.

THE COURT: Why do you want to do that?

THE DEFENDANT: Because Ms. Lennon has not even reviewed any of the facts of the case. There's a video that's - - that's - - was taken at Tim Hortons that shows me clearly not taking the bicycle that's in question, and she says that there is a video of me taking the bicycle and that's just not true. I was there. So I don't believe she has my best interest at heart and I know I do so I - -

THE COURT: Okay.

THE DEFENDANT:   - - I think I'd be better off representing myself.   I've represented myself in this court before - -

. . .

THE COURT:   So sir, just let me explain a couple of things to you.   You can still make the decision that you want to make but let me kind of explain, you know, kind of - - so you have a better understanding of how the process works.

THE DEFENDANT:   I understand pro se, sir.

THE COURT:   So you think you're able to represent yourself.   You also think you're able to read my mind.   Is that what you're telling me? Because that's not at all what I was going to talk to you about.   Okay?

THE DEFENDANT:   Go ahead, your Honor.

THE COURT:   So - - all right. You'll represent yourself.   I - - I was going to try to explain to you the pitfalls of it and Ms. Lennon - - there's a time and place for her to review those types of things and that's in preparation for trial.   She can't review what she doesn't have.   But you're not going to sit in my courtroom and tell me that I can go ahead.   So go on, take him out.

Pretrial Hearing Tr. (Jan.12, 2024), p. 2-4.

{¶ 20} Upon review of the record, the totality of the circumstances reflects that Dingman did not knowingly, intelligently, and voluntarily waive his right to counsel prior to trial.   The trial court failed to explain the nature of the charges, the statutory offenses included within them, the range of allowable punishments, possible defenses to the

charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. The transcript from the pretrial hearing reflects frustration on the part of the trial court when Dingman interrupted the court twice at the moment when it appeared the trial court was going to explain the potential pitfalls in proceeding without an attorney. While such frustration may have been understandable, it did not alleviate the trial court's duty to conduct a thorough colloquy with Dingman before allowing him to waive his right to counsel.

{¶ 21} The question becomes the appropriate remedy for Dingman's uncounseled conviction on a petty offense. We have previously held that the remedy in such a case is to vacate the term of incarceration, including any suspended sentence. *Conard*, 2024-Ohio-1906, at ¶ 23 (2d Dist.) (citing other cases). "We have explained that, while the failure to obtain a valid waiver of counsel as required by Crim.R. 44(B) affects the trial court's ability to impose a sentence of confinement, it does not affect the validity of a defendant's pleas or its findings on those pleas." *Id.*, citing *State v. Lanton*, 2003-Ohio-4715, ¶ 23 (2d Dist.). Rather, the conviction remains valid. *Id.*

{¶ 22} As we noted in *Conard*, "several appellate districts have concluded, based on *State v. Bode*, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156, that this approach is no longer correct." *Id.* at ¶ 24. "They hold that the conviction itself is defective and must be reversed." *Id.*, citing *Euclid v. Hedge*, 2022-Ohio-464, ¶ 27 (8th Dist.), *State v. Ott*, 2017-Ohio-521, ¶ 8 (9th Dist.), and *State v. Wamsley*, 2016-Ohio-2885 (5th Dist.). In *Conard*, we declined to reconsider our position and affirmed Conard's conviction but modified his sentence to remove his jail term. *Id.* at ¶ 26. We will do the

same here.

{¶ 23} The first assignment of error is sustained. The trial court's sentence of 180 days in jail and all of the conditions upon which 150 days of that sentence were suspended must be vacated. Accordingly, Dingman's sentence will be modified to reflect only the other portions of his sentence, i.e., the fine, restitution, and court costs.

III. The Trial Court Did Not Abuse Its Discretion by Denying Dingman's Request for a Continuance

{¶ 24} Dingman's second assignment of error states:

THE TRIAL COURT ERRED BY DENYING DINGMAN'S MOTION
TO DISMISS [SIC].

{¶ 25} "[T]he grant or denial of a continuance is a matter entrusted to the broad, sound discretion of the trial judge, and an appellate court may not reverse the denial of the continuance unless there has been an abuse of discretion." *State v. Miller*, 2005-Ohio-4203, ¶ 45 (2d Dist.), citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985).

{¶ 26} " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial

judge at the time the request is denied.' " *Unger* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). In evaluating a motion for a continuance, the trial court should consider (1) the length of the requested delay, (2) whether other continuances have been requested and granted, (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court, (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived, (5) whether the defendant contributed to the circumstance that gives rise to the request for a continuance, and (6) other relevant factors, depending on the unique facts of each case. *Id.* at 67-68*.*

{¶ 27} At the time Dingman requested a continuance of the trial, his case had been pending for over three months. He did not state in his request how much of a delay he was requesting. Further, he did not state precisely what he needed the extra time to accomplish. Rather, he simply stated that he needed "some time to prepare for court." But he had had months to prepare for court, including several weeks since he had decided to proceed pro se and broke ties with his court-appointed attorney. Presumably, Dingman wanted extra time to obtain a copy of a video recording he believed would exculpate him, given that he raised this issue at the pretrial hearing and in a February 7, 2024 email to the trial court. But there was no evidence that a video recording actually existed that captured the events of October 5, 2023, at the Tim Hortons in Xenia, let alone that such a video recording would exculpate him. Finally, the facts of the case were relatively straightforward.

{¶ 28} Upon the record before us, we cannot conclude that the trial court abused its discretion in denying Dingman's request for a continuance of the trial. The second

assignment of error is overruled.


IV.     Conclusion

{¶ 29} Having sustained the first assignment of error, we will modify the trial court's judgment to remove the jail sentence, including the suspended portion of that jail sentence, and the two years of probation.   The judgment will be affirmed as modified.

. . . . . . . . . . . . .


EPLEY, P.J. and HUFFMAN, J., concur.