[Cite as *State v. Ginyard*, 2026-Ohio-2241.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,                                          CASE NO. 9-25-12

    PLAINTIFF-APPELLEE,

v.

RAKEEM RAMERE GINYARD,                    **OPINION AND**
                                        **JUDGMENT ENTRY**

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 22-CR-401

Judgment Affirmed

Date of Decision: June 15, 2026

APPEARANCES:

    *W. Joseph Edwards* **for Appellant**

    *Allison M. Kesler* **for Appellee**

Case No. 9-25-12

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Rakeem R. Ginyard ("Ginyard") appeals the judgment of the Marion County Court of Common Pleas, arguing that the trial court erred by not permitting him to represent himself and that his rights under the Confrontation Clause of the United States Constitution were violated. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Ginyard would frequently spend weekends at a house in Marion County where his brother and ten-year-old niece, K., lived. On June 5 or 6, 2022, K. was taken to the emergency room to be evaluated by a sexual assault nurse examiner ("SANE nurse").[1] Michelle Hasenkamp Kaiser ("Kaiser") worked as a forensic interviewer at Nationwide Children's Hospital ("Nationwide Hospital"). She began to conduct a forensic interview with K. at around 4:45 A.M. on June 6, 2022. While Kaiser was speaking with K., a SANE nurse was watching their conversation from an observation room.

{¶3} During this recorded forensic interview, K. indicated that she had been sexually abused on multiple occasions by her uncle, Ginyard, at her house in Marion County. K. identified the vaginal area on an anatomical diagram as the area where the inappropriate contact occurred. After speaking with K., Kaiser consulted with

---

[1] The trial testimony indicates that K. either arrived at the emergency room late at night on June 5, 2025 or early in the morning on June 6, 2025.

the SANE nurse about how to proceed with the medical examination. Based upon what K. had reported, samples were taken from inside K.'s vaginal cavity for use in DNA testing.

{¶4} On July 7, 2022, Detective Michael Diem ("Detective Diem") conducted an interview with Ginyard. After being informed of his *Miranda* rights, Ginyard said that he was there to "do the right thing." (Ex. 2). He also admitted that he had "f**ked up" and "betrayed" his brother. (Ex. 2). The following exchange then occurred:

> [Detective Diem:] How long after you moved did they [Ginyard's brother's family] come to Marion?
>
> [Ginyard:] Um, I'd say October or November. I'm not sure.
>
> [Detective Diem:] Shortly after that.
>
> [Ginyard:] Yeah.
>
> [Detective Diem:] This was last year, 2021, right?
>
> [Ginyard:] Yeah.
>
> . . .
>
> [Detective Diem:] They move to Marion. You start visiting. How soon was it when you two started having some kind of sexual relationship?
>
> [Ginyard:] I'd say, October. Like, the first month.
>
> [Detective Diem:] The first month. But nothing before that had happened. No kind of sexual intercourse. No oral. Nothing like that.
>
> [Ginyard:] No.

. . .

[Detective Diem:] How many times do you think you and [K.] . . . have sex?

[Ginyard:]  I would say twice a month.

[Detective Diem:]  Twice a month at least, probably?

[Ginyard:]  Yeah.

. . .

 [Detective Diem:]  So from October

[Ginyard:]  to June.  But I would say January, February, I didn't see her.

[Detective Diem:]  The last time when this got reported to us.  It was a weekend you had visited.  And you guys—she had told the hospital because she had went and got an exam—that you guys had had sex that night before.

[Ginyard:]  Yeah.

[Detective Diem:]  Where was that at?

[Ginyard:]  In her room.

. . .

[Detective Diem:]  Now, when you and her, was there anything ever oral between the two of you?

[Ginyard:]  I did oral.

[Detective Diem]: You did oral?

[Ginyard:]  Yeah.

[Detective Diem]:  Did she ever do oral for you?

[Ginyard:]  No.

[Detective Diem:]  And then intercourse every time you guys were together?

[Ginyard:]  Not every time.

[Detective Diem:]  Every week?

[Ginyard:]  No.

[Detective Diem:]  Every other weekend?

[Ginyard:]  No. It was twice a month.

[Detective Diem:]  When you would come over maybe, twice a week?

[Ginyard:]  It was twice a month.

(Ex. 2).  He also indicated that, when they had intercourse, he did not finish inside her but in his hand.  Ginyard would then tell her to clean up in the bathroom.  He also agreed that his DNA would "probably" be found in the sample taken from K. (Ex. 2).  The police then obtained samples from Ginyard for the purpose of conducting DNA testing.

{¶5} On July 13, 2022, Ginyard was charged with six counts of rape in violation of R.C. 2907.02(A)(1)(b), first-degree felonies.  On March 9, 2023, Ginyard filed a motion to determine his competency to stand trial.  On September 15, 2023, the trial court found that Ginyard was not competent to stand trial and ordered him to receive treatment for a period of one year.  On February 6, 2024, the trial court found that Ginyard was competent to stand trial.

{¶6} On April 11, 2025, Ginyard appeared before the trial court on two separate occasions. At a hearing held at 11:54 A.M., Ginyard indicated that he wished to proceed *pro se*. In response, the trial court finished addressing the matters that had occasioned this hearing; did not permit Ginyard to immediately discharge defense counsel; preliminarily denied his request; and concluded the hearing.

{¶7} At a hearing held at 1:56 P.M., the trial court returned to the matter of Ginyard's representation. The trial court questioned Ginyard extensively about the legal process; discussed the charges at issue; described the benefits of proceeding with counsel; and emphasized the potential risks involved with self-representation. After this colloquy, Ginyard said, "I'll let him [defense counsel] represent me." (Apr. 11 Pt. 2 Tr. 20).

{¶8} On April 29, 2025, this case proceeded to a jury trial where Ginyard was represented by counsel. The prosecution introduced the video recordings of the forensic interview that was conducted with K. at Nationwide Hospital and the police interview of Ginyard with Detective Diem. The State also called Kaiser and Detective Diem as witnesses at trial.

{¶9} Further, Amy Wanken ("Wanken"), a forensic scientist at the Ohio Bureau of Criminal Investigation ("BCI"), testified about the DNA testing performed in this case. Wanken stated that, after the preliminary testing was done by the staff at BCI, she examined the data, performed the required calculations, and documented her conclusions in a written report. She found that the DNA recovered

from the K.'s vaginal cavity was consistent with the profile from Ginyard's DNA sample.

{¶10} At trial, defense counsel objected to Wanken's testimony on the grounds that the preliminary testing on the DNA samples was performed by analysts who were not called to testify at trial. After hearing arguments from the parties, the trial court overruled the objection. On April 30, 2025, the jury returned verdicts of guilty on all six of the charges against Ginyard. On May 13, 2025, the trial court issued its judgment entry of sentencing, ordering Ginyard to serve an aggregate prison term of sixty years.

{¶11} Ginyard filed his notice of appeal on May 15, 2025 and raises the following two assignments of error:

### First Assignment of Error

**The trial court violated the defendant-appellant's constitutional rights when it did not allow him to exercise his right to self-representation.**

### Second Assignment of Error

**The trial court violated the defendant-appellant's constitutional right of confrontation when the victim did not testify and when it accepted the testimony of the forensic scientist when she did not actually do the testing.**

*First Assignment of Error*

{¶12} Ginyard argues that the trial court denied him his right to self-representation by urging him to proceed with counsel.

Legal Standard

**{¶13}** The Sixth Amendment to the United States Constitution reads, in part, as follows: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." While examining this provision in *Faretta v. California*, the Supreme Court of the United States held that

> the right to self-representation—to make one's own defense personally—is . . . necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

*Id.*, 422 U.S. 806, 819-820 (1975). In other words, "the Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.'" *Id.* at 814, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942). *See also* Article I, Section 10, Ohio Constitution; *State v. Gibson*, 45 Ohio St.2d 366, 377 (1976).

**{¶14}** A defendant may exercise the constitutional right to self-representation by "knowingly, voluntarily, and intelligently elect[ing] to do so." *State v. Tasciuc*, 2024-Ohio-5556, ¶ 16 (3d Dist.). However, "[t]he assertion of the right to self-representation must be clear and unequivocal." *State v. Sims*, 2022-Ohio-3365, ¶ 28 (3d Dist.), quoting *State v. Neyland*, 2014-Ohio-1914, ¶ 72 (9th Dist.). This requirement is

> 'necessary to protect . . . against an inadvertent waiver of the right to counsel by a defendant's occasional musings,' and it also 'prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation.'

*State v. Godley*, 2018-Ohio-4253, ¶ 13 (3d Dist.), quoting *U.S. v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000). An unequivocal assertion is not a "momentary caprice," "the result of thinking out loud," an "emotional response," "or the result of frustration." *State v. Kramer*, 2016-Ohio-2984, ¶ 5 (3d Dist.), quoting *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989), *Jackson v. Yist*, 921 F.2d 882, 888 (9th Cir. 1990), and *Lacy v. Lewis*, 123 F.Supp.2d 533, 548 (C.D. Cal. 2000).

{¶15} "[B]efore accepting a defendant's waiver of counsel, the trial court must engage in a painstaking discussion with the defendant to insure that the self-representation decision is knowing, intelligent, and voluntary." *State v. Lee*, 2020-Ohio-3987, ¶ 71 (2d Dist.). "This colloquy, known as a *Faretta* hearing, must include a review of the pending charges, the advantages of having counsel, and the pitfalls of self-representation, so that the defendant's choice is made with his 'eyes open.'" *Id.*, quoting *State v. Obermiller*, 2016-Ohio-1594, ¶ 30.

{¶16} "Courts are to indulge every reasonable presumption against the waiver of a fundamental constitutional right including the right to be represented by counsel." (Citations omitted.) *State v. Dingman*, 2024-Ohio-3327, ¶ 17 (2d Dist.), quoting *State v. Dyer*, 117 Ohio App.3d 92, 95 (2d Dist. 1996). "A court cannot infer a criminal defendant's waiver of counsel from the defendant's silence. . . . Instead, the waiver must affirmatively appear in the record." (Citations omitted.) *State v. Brown*, 2023-Ohio-4436, ¶ 20 (10th Dist.).

{¶17} "[I]f a defendant has made an unequivocal and explicit request for self-representation, a defendant may later waive that request by acquiescing in counsel's representation." *Obermiller*, 2016-Ohio-1594, at ¶ 31. However, "if a trial court denies the right to self-representation when the right has been properly invoked, the denial is per se reversible error." *State v. Houston*, 2010-Ohio-6070, ¶ 7 (3d Dist.), quoting *State v. Cassano*, 2002-Ohio-3751, ¶ 32.

Legal Analysis

{¶18} At the final pretrial hearing, Ginyard informed the trial court that he wished to proceed pro se. The trial court did not permit Ginyard to immediately discharge defense counsel but proceeded to conduct a separate *Faretta* hearing later that afternoon to further address this matter. At this second hearing, the trial court conducted a thorough colloquy that discussed the characteristics of a criminal proceeding, the pitfalls of self-representation, and the advantages of having a defense attorney at trial.

{¶19} During this colloquy, Ginyard repeatedly affirmed that he understood what the trial court was explaining to him and agreed that his defense counsel was a good attorney. The trial judge then said, "I would strongly urge you to have Mr. Johnson represent you, and that you try not to represent yourself." (Apr. 11 Pt. 2 Tr. 20). The colloquy concluded with Ginyard saying, "I'll let him [defense counsel] represent me." (*Id.*).

{¶20} On appeal, Ginyard argues that the trial court violated his constitutional right to self-representation by "strongly urg[ing]" him to proceed with defense counsel at trial. (Apr. 11 Pt. 2 Tr. 20). However, as a general matter, a "defendant must be strongly advised of the dangers and disadvantages of self-representation" before a trial court permits him or her to proceed pro se. *State v. Wamsley*, 2016-Ohio-2885, ¶ 14 (5th Dist.). *See also State v. McAlpin*, 2022-Ohio-1567, ¶ 47.

{¶21} Further, appellate courts have routinely described trial judges as urging defendants not to proceed pro se in the process of apprising him or her of the dangers of self-representation. *State v. Walker*, 2025-Ohio-975, ¶ 40 (1st Dist.); *State v. Simon*, 2021-Ohio-3090, ¶ 48 (4th Dist.); *State v. Lee*, 2025-Ohio-875, ¶ 22 (5th Dist.); *State v. Williams*, 2019-Ohio-2335, ¶ 44 (8th Dist.); *State v. Spencer*, 2017-Ohio-1140, ¶ 16 (10th Dist.); *State v. Payne*, 2014-Ohio-4304, ¶ 36 (11th Dist.).

{¶22} Our review of the record indicates that the trial court conducted an appropriately thorough *Faretta* hearing that properly apprised Ginyard of what self-representation would entail. Thus, we conclude the trial court was, in these challenged statements, merely "comply[ing] with its duty to ensure that it fully informed [Ginyard] . . . of the risks of his decision to represent himself." *Obermiller*, 2016-Ohio-1594, at ¶ 44 (finding that a "rigorous [*Faretta*] inquiry" did not violate the defendant's right to self-representation). After receiving this

information, Ginyard affirmatively made a knowing, voluntary, and intelligent decision to withdraw his request to proceed pro se. *Id*. at ¶ 45.

**{¶23}** In summary, the trial court did not violate Ginyard's right to self-representation by admonishing him to proceed to trial with defense counsel. *See Lee*, 2025-Ohio-875, at ¶ 22 (5th Dist.); *State v. Watson*, 132 Ohio App.3d 57, 64 (8th Dist. 1998), quoting *Gibson*, 45 Ohio St.2d 366, at 373 (1976). Further, the record establishes that Ginyard expressly "abandoned any intention to represent himself." *Obermiller*, 2016-Ohio-1594, at ¶ 49, quoting *Cassano*, 2002-Ohio-3751, at ¶ 42. Accordingly, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶24}** Ginyard argues that his rights under the Confrontation Clause of the United States Constitution were violated.

Legal Standard

**{¶25}** "The Confrontation Clause guarantees the right of defendants in criminal cases 'to be confronted with the witnesses against him.'" *State v. Little*, 2016-Ohio-8398, ¶ 17 (3d Dist.), quoting U.S. Const., Amend. VI.

> The United States Supreme Court has interpreted this to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.

*State v. Scott*, 2025-Ohio-419, ¶ 9 (3d Dist.), quoting *State v. Maxwell*, 2014-Ohio-1019, ¶ 34. Thus, the Confrontation Clause applies to testimonial statements. *State v. Cartwright*, 2024-Ohio-5638, ¶ 34 (3d Dist.).

{¶26} As a general matter, "[s]tatements made for the purpose of medical diagnosis and treatment are nontestimonial." *State v. Arnold*, 2010-Ohio-2742, ¶ 28. In applying this general rule, the Supreme Court of Ohio noted that forensic interviews conducted at child advocacy centers "serve dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Id*. at ¶ 33. The Supreme Court of Ohio ultimately concluded

> that statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause . . . . [but] that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial.

(Citations omitted.) *Arnold* at ¶ 44 (considering a situation in which a recording of the forensic interview at the child advocacy center was introduced at a trial where the child-victim was unavailable to testify). *See also State v. Bansobeza*, 2025-Ohio-2704, ¶ 41 (2d Dist.); *State v. Longworth*, 2026-Ohio-1757, ¶ 47 (4th Dist.).

### Standard of Review

{¶27} Appellate courts apply a de novo standard of review to challenges that allege Confrontation Clause violations. *State v. Burns*, 2026-Ohio-544, ¶ 14 (3d

Dist.). De novo review does not give deference to the trial court's determination but is conducted independently. *State v. Bolen*, 2025-Ohio-5104, ¶ 18 (3d Dist.).

**{¶28}** If a violation of the Confrontation Clause is found, the constitutional error can be found harmless if it was harmless beyond a reasonable doubt. *Scott*, 2025-Ohio-419, at ¶ 11 (3d Dist.). This harmless-error analysis "is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Bush*, 2023-Ohio-4473, ¶ 98 (3d Dist.).

**{¶29}** No such "reasonable possibility" exists "where there is 'overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction.'" *State v. Goff*, 2005-Ohio-339, ¶ 12 (9th Dist.), quoting *State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987). Thus, "Confrontation Clause violations are harmless when 'the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt.'" *State v. Jacks*, 2025-Ohio-2541, ¶ 39 (2d Dist.), quoting *State v. Williams*, 6 Ohio St.3d 281 (1980), paragraph six of the syllabus.

Legal Analysis

**{¶30}** Ginyard raises two main arguments. First, he asserts that his right of confrontation was violated when the State played the recording of the forensic interview from Nationwide Hospital because K. did not testify at trial and was never cross-examined. However, when the State introduced this recording, Ginyard's trial

counsel expressly stated that the Defense had no objection to the jury viewing the entire forensic interview.

**{¶31}** The failure to object to an issue at trial forfeits all but plain error on appeal. *State v. Thomas*, 2020-Ohio-5379, ¶ 16 (3d Dist.); *State v. Noel*, 2026-Ohio-1144, ¶ 20 (9th Dist.).

> For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. . . . Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.

(Citation omitted.) *State v. Bradshaw*, 2023-Ohio-1244, ¶ 21 (3d Dist.). "Plain error is recognized 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Treece*, 2025-Ohio-4319, ¶ 15 (3d Dist.), quoting *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

**{¶32}** In this case, K.'s parents brought her to the emergency room shortly after the last instance of abuse. Kaiser conducted the forensic interview with K. at roughly 4:45 A.M. while the nurse examiner was watching from an observation room. Kaiser testified that this interview was conducted before K. saw the nurse because K.'s answers were going to provide the starting points for the subsequent medical examination. After the interview, Kaiser consulted with the nurse about what to do during the medical examination. For these reasons, Kaiser stated that the interview was conducted "for medical diagnosis and treatment." (Tr. 174).

**{¶33}** But more importantly, a recording of the police interview with Ginyard was played at trial. In this video, Ginyard admitted that he had sexual intercourse with K. at least two times a month between October of 2021 and June of 2022, excluding the months of January and February.[2] He reported that the sexual abuse occurred when he would spend a weekend at his brother's house in Marion County. Ginyard also provided the details of these incidents. He stated that he would not finish inside K. when they were having sex and would have her clean herself up in the bathroom after these interactions. He also admitted that he had performed oral sex on K. during several of these encounters.

**{¶34}** Standing alone, the video recording of Ginyard's confession provided overwhelming proof that he was guilty of raping K. on at least six occasions. *Jacks*, 2025-Ohio-2541, at ¶ 39 (2d Dist.). Even if the recording of the forensic interview had been admitted in violation of the Confrontation Clause, any resulting error would be harmless beyond a reasonable doubt. "Harmless error is a lower standard than plain error," but Ginyard "cannot meet that lower standard, let alone the higher plain error standard due to the nature of the evidence in this case." *Thomas*, 2020-Ohio-5379, at ¶ 27 (3d Dist.). For this reason, we conclude that the first argument is without merit.

---

[2] We note that Ginyard was charged with six counts of rape in violation of R.C. 2907.02(A)(1)(b) when he essentially confessed to committing this crime on up to fourteen occasions.

{¶35} Second, during an objection at trial, Ginyard pointed to the Supreme Court of the United States's recent decision in *Smith v. Arizona*, 602 U.S. 779 (2024), and argued that the evidence about the DNA testing introduced by the State violated the Confrontation Clause. In the case presently before us, Wanken testified that a DNA sample recovered from K.'s vaginal cavity was consistent with Ginyard's DNA profile. Wanken also authenticated a report that she had authored and that detailed her conclusions.

{¶36} However, Wanken indicated that she did not conduct the preliminary testing on these DNA samples and drew her conclusions after reviewing the results of these prior analyses. Based on this testimony, Ginyard asserted that he did not have the opportunity to cross-examine or otherwise confront the other forensic scientist who conducted the preliminary testing and drew the initial conclusions that served as the basis for Wanken's findings.

{¶37} On appeal, Ginyard argues that the trial court's decision to overrule his objection was inconsistent with the holding of *Smith v. Arizona*, 602 U.S. 779. In *Smith*, the Supreme Court of the United States held the following:

> A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. . . . Neither may the State introduce those statements through a surrogate analyst who did not participate in their creation. . . . And nothing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth—because only if true can they

> provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them.

*Smith*, 602 U.S. 779, at 802-803. Other appellate districts in Ohio have examined this holding in cases where an expert's trial testimony purportedly relied on the out-of-court statements or representations of a forensic scientist who was not called as a witness or cross-examined by the Defense. *State v. Hale*, 2024-Ohio-5579, ¶ 72 (1st Dist.); *State v. Smiley*, 2025-Ohio-2674, ¶ 55-64 (8th Dist.); *State v. Noel*, 2026-Ohio-1144, ¶ 24 (9th Dist.).

{¶38} But even if Wanken's testimony and report were admitted in violation of the Confrontation Clause, any resulting error was harmless beyond a reasonable doubt because Ginyard's confession, standing alone, provides overwhelming evidence of his guilt. As noted previously, Ginyard stated in a recorded police interview that he had sexual intercourse with K. roughly two times a month between October of 2021 and June of 2022, excluding January and February. He also admitted to having sexual intercourse with K. several hours before the SANE nurse took the samples from K. that were examined at BCI.

{¶39} We also note that Ginyard was charged with six counts of rape in this case. Wanken's testimony and report did provide some compelling evidence that Ginyard had raped K. on at least one occasion just before her SANE exam. However, this challenged forensic evidence does not, by itself, establish that Ginyard raped K. six times over the nine-month period identified in the amended

indictment. In contrast, Ginyard's recorded confession, standing alone, provides overwhelming proof that he raped K. on at least six occasions in the relevant timeframe. For these reasons, we conclude that this second argument is without merit.

{¶40} In summary, the recording of Ginyard's confession was played for the jury and, standing alone, provided overwhelming proof of his guilt at trial. Thus, even if the forensic interview was admitted in violation of the Confrontation Clause and even if the DNA evidence was admitted in violation of *Smith v. Arizona*, 602 U.S. 779 (2024), the resulting errors were harmless beyond a reasonable doubt. Accordingly, the second assignment of error is overruled.

*Conclusion*

{¶41} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Marion County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WALDICK, J., concur.**

Case No. 9-25-12

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.

_____
John R. Willamowski, Judge


_____
William R. Zimmerman, Judge


_____
Juergen A. Waldick, Judge

DATED:
/hls

-20-